WINDOM, Presiding Judge.
Justin White appeals his two convictions for capital murder and his sentences of death. White was convicted of murder made capital for intentionally taking the life of Jasmine Parker during the course of a rape, see § 13A-5-40(a)(3), Ala.Code 1975, and during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975. The jury, by a vote of 9-3, recommended that White be sentenced to life, in prison without the possibility of parole. The circuit court rejected the jury’s- recommendation and sentenced White to death.

Facts and Pmcedwal History

On the morning of July 11,2006, Parker went to work with her mother, Vanessa Parker, at Sharp „ Cleaners in Vestavia. Parker was not employed at the cleaners; however, she helped Vanessa on occasion. Around 3:00 p.m., Sylvia Williams, Vanessa’s coworker, drove Parker home. After Parker got home, she called Vanessa and asked if she could go to a Captain D’s restaurant with Greg Jelks. Vanessa gave Parker permission to-go.'
Vanessa left work around .6:00 p.m. and went to a funeral home;because a friend had passed away. After leaving the funeral home, Vanessa-drove to her apartment. She arrived at the apartment between 7:00 p.m. and 7:30 p.m. As she entered the apartment, she called -out to Parker but received no response.- -At that point, Vanessa noticed that the apartment was in disarray. The cushions .on the couch were misplaced, the telephone had been knocked from its base, and a .coffee table had been knocked-over.
. Vanessa then began to walk through the apartment and found Parker’s body in a small hall area. Parker was nude from the waist down and her shirt was pulled up, exposing her breasts. Parker’s blue jeans had been tied in a knot around her neck and used to strangle her to death. Upon findingParker’s .body, Vanessa .telephoned emergency 911.
In response to Vanessa’s call to 911, law-enforcement officers were dispatched to the apartment. Steve Owens, an officer with the forensic unit of the Birmingham police department, was called to the scene *182 to collect evidence and diagram the scene.[1] While at the scene, Owens took a number of photographs and collected, among other things: 1) a plastic fingernail that had been found next to Parker’s body; 2) a cigar tip that had been found on a table; and 3) a cigarette butt. Parker’s cellular telephone was never found.
•Dr. Gregory G. Davis, with the Jefferson County Coroner’s Office, performed an autopsy on Parker. • According to Dr. Davis, when he began the examination, Parker’s blue jeans were tied around her neck so tightly he could not get his finger between the blue jeans and her neck. Dr. Davis explained that Parker had abrasions on her neck from the blue jeans. She .also had a nonlethal, five-inch cut on her neck. Dr. Davis testified that Parker had petec-hiae — ruptured blood vessels due to pressure — under her eyelids. According to Dr. Davis, “petechiae [are] something that you ..'. expect to see in someone who has been strangled.” (R. 313.) Dr. Davis concluded Parker had died as a result of asphyxia due to strangulation.
During the autopsy, Dr. Davis swabbed Parker’s mouth, vagina, and anus to look for ' signs of sexual assault. He also swabbed a' stain on her leg. Initially, Dr. Davis did not detect any semen on the swabs. However, after examining the swabs a second time, Dr. Davis detected semen on the swab from Parker’s vagina and on the swab from her leg.
’ The investigation into Parker’s murder languished until Detective Christopher Anderson, the lead detective, realized in August 20Ó8 that none of the evidence collected from the crime scene or from Parker’s body had been sent to the Alabama Department of Forensic Sciences (hereinafter “DFS”) for, testing. The evidence collected from the crime scene and from Parker’s body was then sent to DFS. Nathan Rhea, a forensic scientist at DFS, tested numerous items related to Parker’s murder. According to Rhea, he obtained a DNA profile for saliva located on the cigar tip collected from the apartment and from the semen collected from Parker’s leg and vagina.' Rhea then entered those profiles into a State database and determined that the profiles matched White’s profile.
After the State presented evidence establishing that the DNA collected from Parker’s body and the cigar tip matched White’s profile, it informed the court that it was going to present evidence pursuant to Rule 404(b), Ala. R. Evid., establishing that White also had raped and murdered Sierra Black. White objected on- several occasions to the introduction of evidence relating to his guilt in Black’s rape/murder. White argued that the two rape/murders were not so similar as to constitute signature crimes. He also argued that the introduction of evidence relating to the Black murder was unduly prejudicial. The circuit court overruled White’s objection but agreed, on White’s request, to give a limiting instruction.
After giving the jury a limiting instruction relating to the 404(b) evidence, the State presented evidence establishing that White’s DNA was in the State database because he had been convicted of capital murder for raping and killing Black. The State also presented considerable evidence establishing that, White had raped and murdered Black in a manner similar to the rape and murder of Parker. The State presented evidence establishing that White murdered Black, .who like Parker was a young African-American woman, by stran *183 gling her to death with a piece of her clothing while raping her.' The State established that Black and Parker had similar body types and that both women were strangled with soft ■ ligatures (their clothes), a manner of strangulation that is extremely rare. The State presented evidence indicating that items belonging to both women were kept by the murderer. Further, the State established that White had murdered Black slightly under four rrionths after Parker was murdered.
To establish that White raped and murdered Black, the State presented White’s confession. The State also presented' testimony‘from the following witnesses who were involved in 'the investigation into Black’s rape/murder: 1) the evidence technician who collected evidence relating to Black’s murder; 2) the pathologist who performed the autopsy on Black’s body; 3) the scientist with DFS who linked forensic evidence collected- from Black’s body to White; and 4) the detective who interviewed White regarding the Black rape/murder. The State presented extensive evidence regarding the details of Black’s injuries. It also admitted numerous photographs of Black’s body and the crime scene.
During its final jury instructions in the guilt phase, the circuit court again instructed the jury regarding its consideration of evidence of the Black rape/murder. Specifically, the circuit court instructed the jury that it could consider White’s -involvement in the Black rape/murder as evidence only of his identity as the perpetrator in the Parker rape/murder. After being instructed by the circuit court, the jury found White guilty of both counts of capital murder charged in the indictment.

Standard of Review

Because White has been sentenced to death, according to Rule 45A, Ala. R.App. P., this Court must search the record for “plain error.” Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”” Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App. 1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
. “ ‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in *184 which a miscarriage of justice would otherwise result.” United Staten v. Frady, 466 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 866 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).”
11 So,3d at 938. “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 118, 121 (Ala.Crim. App.1999), aff'd, 820 So.2d 162 (Ala.2001). Although White’s failure to object at trial will not'bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).
I.
On appeal, White first argues that the circuit court erroneously allowed the State to present evidence of his involvement in the Black rape/murder under Rule 404(b), Ala. R. Evid. In his brief, White asserts that evidence relating to the Black rape/murder was not admissible under Rule 404(b) for a number of reasons, including that the crimes were dissimilar and the evidence was overly prejudicial. This Court disagrees.[2]
 Initially, this Court notes:
“‘The admission or exclusion of evidence is a matter within the sound discretion of the trial court.’ Taylor ,v. State, 808 So.2d 1148, 1191. (Ala.Crim. App.2000), aff'd, 808 So.2d 1216 (Ala. 2001). ‘The question of admissibility of evidence is generally left to the discretion . of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion,’ Ex parte hoggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission- of eollateral-bad-acts evidence. See Davis v. State, 740 So.2d 1116, 1130 (Ala.Crim.App. 1998). See also Irvin v. State, 940 So.2d 331, 344-46 (Ala.Crim.App.2006).”
Windsor v. State, 110 So.3d 876, 880 (Ala. Crim.App.2012).
Further, Rule 404(b) provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive,. opportunity, intent,' preparation, plan, knowledge, identity, or absence of mistake or accident. ...”
The Alabama Supreme Court has “held that the exclusionary rule prevents the State from using evidence of a defendant’s prior bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial.” Ex parte Drinkard, 777 So.2d 296, 302 (Ala.2000) (citing Ex parte Gofer, 440 So.2d 1121, 1123 (Ala,1988)). This Court has explained that “ ‘[o]n the trial for the alleged commission of a particular crime, evidence *185 of the accused’s having committed another act or crime is not admissible if. the only probative function of such evidence is to prove bad character and the accused’s conformity therewith.’” Lewis v. State, 889 So.2d 628, 661 (Ala.Crim.App.2008) (quoting C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (5th ed.1998)).
“<«‘This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’sbad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value- that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ ” ’ ”
Ex parte Jackson, 33 So.8d 1279, 1284-85 (Ala.2009) (quoting Robinson v. State, 528 So.2d 343, 347 (Ala.Crim.App.1986), quoting in turn Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting in turn, McElroy’s. § 69.01(1)).
The State is not, however, prohibited from ever presenting evidence of a defendant’s prior bad acts. Rather, “the exclusionary rale operates to exclude only evidence of other crimes that is offered as proof of the defendant’s bad character.” Windsor, 110 So.3d at 880 (citing Tyson v, State, 784 So.2d 328, 346 (Ala.Crim.App.), aff' d, 784 So.2d 357 (Ala.2000)). As this Court stated in Harris v. State:
“If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible. [Some] well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (8) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show, motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.”
Harris v. State, 2 So.3d 880, 907 (Ala. Crim.App.2007) (internal citations and quotations omitted). However, “ff]or collateral-act .evidence to be admissible for one of the. ‘other purposes! in Rule 404(b), there must be ‘ “a real and open .issue as to one or more of those ‘other purposes.””” Draper v. State, 886 So.2d-105, 117 (Ala. Crim.App.2002) (quoting Gillespie v. State, 549 So.2d, 640, 645 (Ala.Crim.App.1989), quoting in turn Bowden v. State, 538 So.2d 1226, 1227 (Ala.1988)).
“‘When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the- crucial consideration. The physical similarity must be such- that it marks the offenses as the handiwork of the accused.’ ” Ex parte Baker, 780 So.2d 677, 680 (Ala.2000) (quoting United States v. Clemons, 32 F.3d 1504,1508 (11th Cir.1994), further citations omitted). In other words, “ ‘[ejvidence of a prior crime is admissible only when .the circumstances surrounding the prior crime and those surrounding the presently charged crime “exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.” ’ ” Irvin v. State, 940 So.2d 331, 347 (Ala.Crim.App.2005) (quoting Ex parte Arthur, 472 So,2d 665, 668 (Ala.1985), quoting in turn Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983)).
“‘Under the identity exception to the general exclusionary rule prohibiting the admission of other or collateral crimes :as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged, crime are “signature crimes” having the accused’s mark *186 and the peculiarly distinctive modus op-erandi so that they may be said to be the work of the same person.’ ”
Irvin, 940 So.2d at 347 (quoting Bighames v. State, 440 So.2d 1231, 1233 (Ala.Crim. App.1983)). “ ‘Much more is demanded than the mere repeated commission of crimes of the same-class, such as repeated ... rapes. The pattern and characteristics of the crimes friust be so unusual and distinctive as to be like a signature.’” Hurley v. State, 971 So.2d 78, 83 (Ala.Crim.App.2006) (quoting 1 McCormick on Evidence § 190 at 801-03 (4th ed.1992)) (footnotes omitted). ‘“[T]he mere .prior occurrence of an act similar in its gross features — i.e., the same doer, and the same sort of. act, but not necessarily the same mode of acting nor the same sufferer’ ” is insufficient. Brewer, 440 So.2d at 1162 (quoting 2 J. Wigmore, Wigmore on Evidence § 304 at 261 (Chadbourn rev.1979)).
At trial, White’s theory was that he was not the individual who murdered Parker. Accordingly, White’s identity as the individual who murdered Parker was at issue. “Considering there was no eyewitness to [Parker’s] murder,- it was' necessary for the State to present other evidence proving the identity of the-killer.” Petric v, State, 167 So.3d 176, 192 (Ala.Crim.App.2013). Further, the circumstances of the Black rape/murder and Parker rape/murder were sufficiently similar to admit evidence of the Black rape/murder under the identity exception contained in Rule 404(b). White murdered both Parker and Black by strangling them to death with a soft ligature, a method of strangulation that is extremely rare. In fact, he strangled both women with their clothing. In both rapes, White did not wear a condom and, left his semen on his victims.[3] The State established that both victims were young, black women with similar body types. The State presented evidence" indicating that items belonging to both women were kept by the murderer. Further, the State established that White murdered Black slightly under four months after Parker'was murdered. Because- the evidence established that White’s two crimes were peculiarly distinctive, the circuit “court did not exceed its discretion in finding that the evidence of [White’s] bad acts against [Black] was admissible under Rule 404(b) as proof of [his] identity [as Parker’s] killer.” Petric, 157 So.3d at 193.
Further, this Court has thoroughly reviewed the record and holds that the probative value of the evidence establishing that White raped and murdered Black was not substantially outweighed by unfair prejudice. See Averette v. State, 469 So.2d 1371, 1373-74 (Ala.Crim.App.1986) (holding that “not only must it be determined that the other offenses are‘material and relevant to an issue other than the character of the accused and fall within an exception to the exclusionary rule, but the probative value must not be substantially outweighed by undue prejudice”); Rule 403, Ala. R, Evid. (providing that, “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence”). As this Court recently reiterated in Petrie:
“ ‘ “Judicial inquiry does not end with a determination that the evidence of another crime is relevant *187 and probative of a necessary element of the charged- offense. It does not suffice simply to see' if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.” United States v. Turquitt, 557 F.2d 464, 468-69 (5th Cir.1977) (citations omitted).
‘“However, it is “only when the probative value of evidence is ‘substantially outweighed by the danger of unfair prejudice,’ ... that relevant evidence should be excluded.” United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir.1982) (emphasis in original). “[T]he probative value of the evidence of other offenses must also be balanced against its ‘prejudicial nature’ to determine its admissibility. ‘Prejudicial’ is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.” State v. Daigle, 440 So.2d 230, 235 (La.Ct.App.1983).
“‘“Of course, ‘prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant herb is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.’ State v. Hurd, Me., 360 A.2d 525, 527 n. 5 (1976), quoting McCormick, Handbook on the Law of Evidence § 185 at 439 n.31 (2nd ed.1972).”
“ State v. Forbes, 445 A.2d 8, 12 (Me. 1982).’” ’
157 So.3d at 194 (quoting Averette, 469 So.2d at 1374).
As explained above, White’s identity as Parker’s killer was at issue in this case. Thus, White’s involvement in the Black murder was relevant to prove his identity as Parker’s rapist and murderer. Although the evidence- establishing that White raped and murdered Black was prejudicial in that it established his identity in the Parker rape/murder, it was not unduly or unfairly prejudicial. Both the. State and defense counsel informed the jury not to let emotions enter the deliberations, Additionally, as- discussed below, the circuit-court instructed the jury that it could consider evidence of the Black rape/murder only for the purpose of establishing White’s identity, in the.Parker rape/murder. Accordingly, this Court holds that the circuit court acted within its broad discretion in determining that the probative value of evidence relating to the Black rape/murder was not substantially outweighed by undue prejudice.
Because evidence reláting to the Black rape/murder was admissible under Rule 404(b) to establish White’s identity as Parker’s rapist and murderer and because such evidence was not unduly prejudicial, the circuit court did not clearly abuse its discretion by allowing such evidence to be admitted. Therefore, this issue does not entitle White to any relief.
IL
White next argues that the circuit court’s limiting instruction regarding how the jury - could consider evidence of the Black rape/murder was overly broad. Specifically; White asserts that the circuit *188 court “committed plata error by failing to limit the jury’s consideration of this evidence ‘to only those purposes for which the evidence was purportedly offered by the State,’ e.g., identity and intent.” (White’s brief, at 25 (quoting' Ex parte Billups, 86 So.3d 1079, 1086 (Ala.2010))). White did not object to the circuit court’s instruction; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
In Ex parte Billups, the Alabama Supreme Court held that the circuit court’s jury instruction that allowed the jury to consider . collateral-bad-acts evidence for purposes contained in Rule 404(b) that were implausible in that case amounted to plain error. 86 So.3d at 1085-86. After the State presented evidence establishing that Billups had -committed collateral crimes, the-circuit court gave a limiting instruction-that allowed the jury to consider that evidence for all the purposes listed in Rule 404(b), Ala. R. Evid.-, i.e., the court instructed the jury that it could consider evidence of Billups’s collateral crimes as proof of “motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.” Billups, 86 So.3d at 1082. Under the facts of .that case, a number of the purposes on which the jury was instructed were implausible or not at issue. Id. at 1086. In reversing Billups’s conviction and sentence, the Court held:
‘“[A limiting] instruction [regarding prior-bad-act evidence admitted under Rule 404(b), Ala. R. Evid.,] should advise the jury on the. purposes for which prior acts are admitted, meaning uses that are plausible in the case at hand, and should not include a laundry list of every conceivable use.’ 1 Christopher B. Mueller and Laird-C. Kirkpatrick, Federal Evidence § 4:30 at 789 (3d ed.2007) (emphasis added). In this case, however, the jury was allowed to consider the' evidence regarding Billups’s involvement in the Avanti East killings for several implausible purposes, including, among others, opportunity and absence of mistake or accident. For example, Billups made no argument at trial that Lockett’s killing was the result of an accident or that he lacked the opportunity to kill Lockett; rather, Billups’s defense was ■that another person, Charles Cooper, was responsible, for Lockett’s murder.
“By simply reciting' the complete ‘laundry list of permissible theories under Rule 404(b), [Ala. R. Evid.,] the trial court’s instruction in this case gave the jury inadequate guidance. See Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008) (‘[A]n appellate court “presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.” ’ (quoting Cochran v. Ward, 935 So.2d 1169, 1176 (Ala.2006))). The trial court’s instruction also failed to limit the State to the purposes — as nonspecific as they were — that ⅜ advanced in support of admission of the evidence regarding Billups’s' involvement in the Avanti East killings. Thus, we conclude that the trial court erred by failing to limit the jury’s consideration of that evidence to only those purposes for which the evidence was purportedly offered by the State (plan,. identity, motive, and intent). See Huddleston [v. United States, 485 U.S. 681 (1988) ]; cf. United Slates v. Tse, 375 F.3d 148, 158 (1st Cir.2004) (finding that the district court ‘adequately limited the jury’s consideration of [certain Rule 404(b) ] evidence’ when the court instructed the jury that it could not use that evidence ‘to make a propensity inference’ and that the jury could use that evidence to , determine only the defendant’s ‘knowledge and intent’).”
Ex parte Billups, 86 So.3d at 1086 (footnotes omitted).
*189 Here, unlike in Billwps, the circuit court did not allow the jury to consider White’s prior bad act for all the purposes listed in Rule 404(b). In its final jury instructions during the guilt phase, the circuit court stated:
“Now, you’ve heard lawyers talk about 404(b) evidence. And the Court gave you a limited instruction earlier.
“The law sajte this:
“ ‘Evidence of other crimes, wrongs or acts, are not admissible to prove the bad character of a person in order to show action in conformity therewith.’
“In other.words, a presently charged trial. We don’t go back and bring in evidence of other bad stuff that the Defendant may haye done, to show that he has a bad character. That he’s a bad ‘person. The law does not allow that.
“It may, however, be admissible for other purposes, such as[:] proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
“So the law states that evidence of a prior crime is admissible only when the circumstances surrounding a prior crime[,] [a]nd those surrounding the present crime charge[dj, exhibit[] such a great degree of similarity, that anyone viewing the two offenses would naturally assume them to have been committed by the same person.
"The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.
“So whore the charged crime, and the collateral crime are committed in the ■same novel or peculiar manner[,] [e]vi-dence of the collateral crime is admissible to identify the Defendant as the perpetrator of the now charged crime.
“So evidence of other crimes is legally admissible as proof of identity. That is, showing that these two offenses were committed by the same person.
“Now, the State'cannot use the commission of the other offense[,] [t]hat is the Bessemer case regarding Sierra Black, [s]imply the commission of that other offense to prove, that the Defen-. dant committed this offense concerning Jasmine Parker. Th[at] must be proved independently.
“So in ... determining the question of the identity of the person in this case[,] [t]he jury can look at the manner and the way that the1 other offense was committed. If it has proven — and it, meaning, the State — has proven that both matters were so similarly committed, that a reasonable person would believe that they necessarily were committed by the'same person.
“Is that clear, ladies and gentlemen?”
(R. 603-05.)
In its final instructions, the circuit court informed the jury that evidence of collateral bad .acts is not admissible, to prove bad character; however, it may be admissible to. prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' After informing the jury of the possible purposes for which evidence of collateral crimes may be admitted, it then restricted the jury’s consideration of 'White’s collateral crimes to determining his identity only. Accordingly, unlike in Billups, the circuit court did “limit the jury’s consideration of ... evidence [of White?s collateral crime] to only th[e] purpose[ ] for which [it] was ... offered by the State,” i.e., to establish White’s identity.' Ex parte Billups, 86 So.3d at 1086. Consequently, no error, much less plain error, resulted from the circuit court’s jury instruction.
*190 III.
White next argues that the circuit court erroneously admitted his statement relating to the Black rape/murder. Specifically, White argues that the circuit court should have suppressed his statement in which he confessed to murdering Black because the police deliberately .used a “two-step” or “question first and warn later” tactic — a tactic wherein police first obtain a statement without providing the suspect with the.warnings established in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and then subsequently obtain a properly Mirandized statement. See Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). According to White, the police deliberately used the “two-step” .or “question first and warn later” tactic to obtain, his confession and did not take any steps.to cure the taint of the first, unwarned statement; therefore, his statement should have been suppressed under the Supreme Court’s decision in Seibert.
Initially, this Court notes that, although White sought to have his confession suppressed, he- did not do so based upon the “question first-and warn later” argument he raises in this Court. Because White raises his “question first and warn-later” argument for the first time on appeal, it will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
Further, it is important- to note that, other than his “question first ■ and warn later” argument, White does not challenge the voluntariness of his postwarning statement. And rightfully so. On direct appeal from his capital-murder conviction relating to Black, this Court thoroughly reviewed the voluntariness of White’s postwarning statement and held that it was knowingly- and-voluntarily given and, therefore, - admissible.[4] White v. State (No. CR-07-1172), 75 So.3d 1225 (Ala. Crim.App.2010) (table).
. Thus, the question before this Court is whether White’s otherwise knowing and voluntary statement given after he was read his Miranda rights was inadmissible under Seibert, 542 U.S. 600, because the police did not read White his rights until after the interview was already underway. And, if so, whether the error in admitting that statement amounted ,to plain error.
Regarding a properly warned confession given after an unwarned statement, courts look to two decisions of the Supreme Court of the United States: Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and Seibert, 542 U.S. 600. The United States Court of Appeals for the Eleventh Circuit has explained the interplay between those two decisions as follows: - -
“In determining whether a properly warned confession' is admissible where the defendant has first given an unwarned or improperly warned confession, we turn to the Supreme Court’s decisions in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Elstad sets out the general rule that the existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily made, 470 U.S. at 309, 105 S.Ct. at 1293, while Seibert sets out an exception for situations where police employ a deliberate *191 ‘question first’ strategy. 542 U.S. at 617, 124 S.Ct. at 2613.
“In Elstad, the defendant confessed after being subjected to unwarned custodial questioning at his house. 470 U.S. at 300-01, 315, 105 S.Ct. at 1288-89, 1296. The officers then took the defendant to their headquarters and an hour later gave him Miranda [v. Arizona, 384 U.S. 436 (1966) ] warnings for the first time. [Elstad, 470 U.S.] at 301, 105 S.Ct. at 1289. He waived his rights and made a full confession, both orally and in a signed statement. Id. The Supreme Court rejected the defendant’s contention that the second confession should have been suppressed as ‘fruit of the poisonous tree,’ the poison being the failure to advise him of his rights before he confessed the first time. Id. at 302, 309, 105 S.Ct. at 1289, 1293. The Court explained that it would be an ‘unwarranted extension of Miranda’ to suppress not only unwarned statements but also later statements that were knowingly and voluntarily made after proper warnings were finally given. Id.
“The rule of Elstad is that ‘the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.’ Id. In making this determination courts are not to presume that the existence of the earlier unwarned statement compelled the defendant to give another one, but instead should assume that ordinarily giving proper Miranda warnings removes the effect of any conditions requiring suppression of the unwarned statement. Id, at 314,105 S.Ct. at 1296. Where both confessions are voluntary, there is no justification for suppressing the ‘highly probative evidence of a voluntary confession.’ Id. at 312, 105 S.Ct. at 1294-95; see also id. at 318, 105 S.Ct. at 1298 (‘The relevantl inquiry is whether, in fact, the second statement was also voluntarily made.’).
“The Elstad general rule applies both to instances, like this one, where the initial statements are inadmissible because of defective warnings and to those where no warnings were given at all before the first statements. See Bryant v. Vose, 785 F.2d 364, 366-67 (1st Cir.1986); Watson v. DeTella, 122 F.3d 450, 453-55 (7th Cir.1997)....
“The Elstad general rule is subject to the SeibeH exception, which is aimed at putting a stop to the deliberate use of a particular police tactic employed for the specific purpose of undermining the Miranda rule. 542 U.S. at 618, 124 S.Ct. at 2614 (Kennedy, J., concurring). The tactic in question is one where the police are instructed, as a matter of policy, to purposefully withhold Miranda warnings while interrogating a suspect in custody in order to obtain a full confession first and then provide him with full warnings and get hjm to re-confess. Id. at 605-06, 124 S.Ct. 2601. The process is known as the ‘two-step’ or ‘question first’ tactic, and it did not find favor in the Supreme Court.
“Because Seibert is a plurality .decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law. United States v. Gonzalez-Lauzan, 437 F.3d 1128, 1136 n. 6 (11th Cir.2006); see also Romano v. Oklahoma, 512 U.S. 1, 9, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994); Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). As Justice Kennedy explained, suppression of a post-warning confession is required if ‘the two-step interrogation technique [is] used in a calculated way to undermine the Miranda warning.’ Seibert, 542 U.S. at 622, 124 S.Ct. at 2616. That means that if an officer *192 employs a strategy of deliberately questioning an in-custody suspect without any Miranda warnings' in order to'get a confession, planning- to later warn the suspect and get him to repeat his confession, -the' post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the Miranda decision intended. Id. at 621, 124 S.Ct. at 2615-16. The curative measures required are a ‘substantial break in time and circumstance between the prewarning statement and the Miranda warning’ or ‘an additional warning that explains the likely inadmissibility of the prewarning custodial statement.’ Id. at 622, 124 S.Ct. at 2616. Curative measures are necessary only- where the' [deliberate] ‘question first’ tactic has been used. Otherwise, the Elstad general rule that post-warning' statements are admissible, even where they follow pre-warning statements that are not, governs.”
United States v. Street, 472 F.3d 1298, 1312-14 (11th Cir.2006).
Here, the record indicates that the failure to read White the Miranda warnings until after the interview was underway was not deliberate or for the-purpose of getting an unwarned confession in order to later Warn White and get him to repeat his confession. WÍúte was initially questioned without being warned of his rights. The questions were" not accusatory and dealt mainly with his relationship with Black and the day he lást saw her. During that portion of the interview, White did not confess to murdering Black. After a brief period, the following occurred:
‘‘[Detective]: [T]here is something that I need, to do I .forgot my boss got a pen. . ; -
[[Image here]]
“And you’ve heard this on TV before. Before asking you any questions it’s the law you must be advised of your following constitutional rights. You have the right to remain silent. . Anything you say can and will be used- against you in a court of law. You have-the right to talk to a lawyer and .have him present with you while you’re being questioned. If you cannot, cannot hire a lawyer one will be appointed to represent you before any questioning if you wish one. You can decide at any time to exercise these rights and not answer any questions or make any statements. Uh do you understand each of these rights I’ve explained to you?” .
(C. 249-50.) Thereafter, White stated that he understood his rights and wished to waive them. He then signed a form waiving his rights.
From the -record, it appears that the officers’ failure-to give White the Miranda warnings was unintentional rather than deliberate.' See (G. 249) (“[T]here is something that I need to do I forgot — ”). Further, - the officers did not question White in an accusatory manner or obtain any confession before he was read the Miranda warnings. Thus, the. record does not show that.the officers were “deliberately questioning [White] without any Miranda warnings in order to get a confession, planning to later warn [White] and get him to repeat his confession....” Street, 472 F.3d at 1314. Accordingly, the general rule established in Elstad applies.
Further, as discussed in this Court’s memorandum opinion affirming White’s capital-murder conviction relating to Black, White’s- confession “was knowingly, voluntarily, and intelligently given after proper Miranda warnings and was admissible into evidence.” White v. State (No. CR-07-1172), .75 So.3d 1225 (Ala.Crim. App,2010) (table). Because White’s post- *193 warning confession was knowingly and voluntarily given, under Elstad) no error, much less plain error, resulted from the statement’s admission into' evidence. See Rule 45A, Ala. R.App. P.; Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that to rise to the level of plain error, the error must be “obvious on the. face of the record”). Therefore, this issue does not entitle White to any relief.
IV.
White next, argues that the State exercised its peremptory strikes in a discriminatory manner against women in violation of J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and that this Court should remand this cause for a hearing at which the State would be inquired to provide gender-neutral reasons for its strikes. Specifically, White argues that the State used 12 of .its 14 peremptory strikes against women, that a pattern existed in the State’s use of its strikes against women, and that the' State treated women disparately. According to White, each of these factors establish a prima facie J.E.B. violation. He further argues that the State demonstrated its consciousness of gender issues by asking the venire-members whether they could believe that a handsome, educated, well dressed individual like White could have committed the acts with which White was charged. According to White, this question established that 'the State was worried that- women would find' him too attractive to be guilty. White did not raise a J.E.B. objection at trial.
Initially, this Court questions whether this issue is properly before this Court. In his special writing concurring-in-result in Ex parte Floyd, [Ms, 1080107, September 28, 2012] — So.3d —— (Ala.2012), Justice Murdock listed the reasons why the three-step evidentiary inquiry prescribed by Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and, by extension, J.E.B.[5] “is not an inquiry that can be initiated on appeal- as a result of a plain-error review.” Ex parte Floyd, — So.3d at-. Those reasons were:
“First, Batson [v. Kentucky, 476 U.S. 79 (1986),] itself, as well as its progeny, appears to contemplate a testing of the prosecutor’s. reasons for his or her strikes contemporaneously with the making' of those strikes. Nothing in Batson suggests that the prosecutor is to be required to articulate, and defend his or her reasons for striking certain jurors long after the selection process has ended, both sides have accepted the jury, the jurors have performed their service, and a verdict has been' rendered. To the contrary, ‘[t]he Supreme Court’s analysis in Bat-son envision[s] -a “timely objection” to the government’s use of' peremptory challenges. 476 U.S. at 99_’ United States v. Dobynes, 905 F.2d 1192, 1196 (8th Cir.1990). As the United States Court of Appeals for the First Circuit has stated: ‘[Contemporaneous objection is especially pertinent as to Batson claims, where innocent oversight can so readily be remedied and an accurate record of the racial composition of the jury is crucial on appeal.’ United States v. Pulgarin, 955 F.2d 1, *194 2 (1st Cir.1992). See United States v. Tote, 586 F.3d 936, 943-44 (11th Oir. 2009) (‘Under the law of this Circuit, a Batson objection must be exercised before the venire is dismissed and the trial commences. United States v. Rodriguez, 917 F.2d 1286, 1288 n. 4 (11th Cir.1990).’); United States v. Romero-Reyna, 867 F.2d 834, 837 (5th Cir.1989) (holding that a Batson objection ‘must be made before the venire is dismissed and before the trial commences’). In short, ‘[t]he case law is clear that a Batson objection must be made as soon as possible.’ United States v. Contreras-Contreras, 83 F.3d 1103, 1104 (9th Cir.1996) (citing Dias v. Sky Chefs, Inc., 948 F.2d 532, 534 (9th Cir.1991)).
“Second, there are sound ‘policy’ reasons why a Batson inquiry, if it is to be conducted, must be conducted at trial contemporaneously with the jury-selection process that is its subject. If the inquiry is launched before the jury is sworn or before the venire is excused, remedies other than reversal and retrial are available. More importantly, in most cases, the type of inquiry contemplated by Batson simply cannot be undertaken in any meaningful way months or years after the trial. Pretrial research regarding jurors and real-time notes taken during voir dire may have been lost, and, more importantly, unwritten memories and impressions of body language, voice inflections, and the myriad of other nuances that go into striking jurors likely will have faded, not only for counsel, but also for the judge who must evaluate the positions of both the defendant and the prosecutor in the context of his or her own observations at trial (and who, in some cases, will have even left the bench in the meantime).
“ ‘[A Batson objection] clearly comes too late if not made until after the trial has concluded. See Thomas v. Moore, 866 F.2d 803, 804-05 (5th Cir.[1989]), cert. denied, 493 U.S, 840, 110 S.Ct. 124, 107 L.Ed.2d 85 (1989); Munn v, Algee, 730 F.Supp. 21, 29 (N.D.Miss.1990). At that point, the only remedy for purposeful discrimination against black venirepersons is reversal of the conviction, whereas a timely objection allows the trial court to remedy the discrimination prior to the commencement of trial. See United States v. Forbes, 816 F.2d 1006, 1011 (5th Cir.1987). Moreover, when the objection is not made until well after completion of the jury selection process, the recollections of the parties and the trial court may have dimmed, making the creation of an adequate record for review more difficult. See [Government of Virgin Islands v.] Forte, 806 F.2d [73] at 76 & n. 1 [ (3d Cir.1986) ].’
“United States v. Dobynes, 905 F.2d at 1196-97.
“In Batson itself, the Court recognized that ‘ “a finding of intentional discrimination is a finding of fact”’ and that ‘the trial judge’s findings ... largely will turn on evaluation of credibility....’ 476 U.S. at 98 n. 21, 106 S.Ct. 1712 (citation omitted). As the Supreme Court subsequently has observed:
“ ‘The trial court has a pivotal role in evaluating Batson claims. Step three of the Batson inquiry involves an evaluation of the prosecutor’s credibility, see 476 U.S., at 98, n. 21, and “the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge,” Hernandez [v. New York], 500 U.S. [352], at 365 [ (1991) ] (plurality opinion). In addition, race-neutral reasons for peremptory challenges often
*195 invoke a juror’s demeanor (e.g., nervousness, inattention), making the trial court’s first-hand observations of even greater importance. In this situation, the'trial court must evaluate not only, whether the prosecutor’s demeanor belies a discriminatory intent, but also whether the juror’s demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by " the prosecutor. We have recognized that these determinations of credibility and demeanor lie “ ‘peculiarly within a trial judge’s province,’” ibid, (quoting Wainwright v. Witt, 469 U.S. 412, 428, 106 S.Ct. 844, 83 L.Ed.2d 841 (1985)), and we have stated that “in.the absence of exceptional circumstances, we would defer to [the trial court].” 500 U.S., at 366.
“Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (emphasis added).
“The United States Court of Appeals for the Sixth Circuit emphasizes statements made by the United States Supreme Court in Batson and another case:
“ ‘[T]he Batson opinion is replete with references to the trial court’s central role in assessing the facts necessary to conduct the three-step inquiry into allegations of racially discriminatory peremptory challenges. For example, Batson maintains that “[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant' circumstances.” Id. at 96 (emphasis added). Likewise, the Batson Court vests its “confidence” in “trial judges, experienced in supervising voir dire, ... to decide if the circumstances concerning the prosecutor’s use of peremptory challenges create a prima facie case of discrimination.” Id. at 97, 106 S.Ct. 1712 ([some] emphasis-added). Bat-son further holds “the trial- court will then have the duty to determine if the defendant has established purposeful discrimination.” Id. at 98 ([some] emphasis ’ added). In explaining its assignment of the Batson inquiry to trial 'courts, the Court emphasizes that “findings in the context under consideration here will largely turn on evaluation of credibility.” Id. at 98 n. 21,106 S.Ct. 1712. Accordingly, the Court informs reviewing courts that they “ordinarily should give those findings great deference.” Id.
‘“In emphasizing the holdings of Batson, the Hernandez [v. New York, 500 U.S. 352 (1991),] plurality explains:
“ ‘ “In the., typical peremptory challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often mil be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility, lies peculiarly within a trial judge’s province.” [1] ,
“ ‘Hernandez, 500 U.S. at 365.’
“Harris v. Haeberlin, 526 F.3d 903, 913 (6th Cir.2008)(some emphasis added).
“The most pointed conclusion in this regard appears to have been framed by the United States. Court of Appeals for the Fifth Circuit, after reasoning as follows:
“ ‘A timely objection and the corresponding opportunity to evaluate the circumstances- of the jury selection process are essential to a trial court’s *196 reasoned application of the limitations placed on peremptory challenges by the Batson holding. The decision to exercise a peremptory challenge, in contrast to a challenge for aa¡tm, is subjective; and, often, the reasons behind that decision cannot be easily articulated. . Determining whether a .prosecutor has acted discriminatorily in his use of a peremptory challenge depends greatly upon the observations of the presiding judge. See,Batson, 476 U.S. at 98 n. 21,106 S.Gt. at 1724 n. ,21. Batson “requires] trial courts to be sensitive to the racially discriminatory use of peremptory challenges.” Id. at 99, 106 S.Gt. at. 1724. This firsthand review by the trial court is vital to the balance struck between the historical role and practice of peremptory challenges and the demands of equal protection.' See id. at 97, 98-99 & n. 22, 106 S.Gt. at 1728, 1724 & n. 22.’
“Thomas v. Moore, 866 F.2d at 805 (emphasis added). For this reason, the Court of Appeals concluded that f tjhe evidentiary rule established in Batson does not enter the analysis of a defendant’s equal protection claim wúess a timely objection is made to the prosecutor’s use of his peremptory challenges. Id. at 804 (emphasis added).
“As if the foregoing' policy concerns were not enough, without a general rule requiring the initiation of a Batson challenge at trial, counsel for a defendant charged with a capital offense might decide — -and logically so — to take a ‘shot’ at getting a favorable verdict from a jury about which he or she has some doubts, secure in the knowledge that he or she can always raise a Batson objection on appeal and get a second ‘shot’ if things do not work out- with the first jury. See generally, e.g., United States v. Pielago, 135 F.3d 703, 709 (11th Cir.
1998) (‘The contemporaneous objection rule fosters finality of judgment and deters-“sandbagging” saving an issue for appeal in hope of having another shot at trial if the first one misses.’); United States v. Brown, 352 F.3d 654, 666 n. 12 (2d Cir.2003) (‘[W]e do not want to encourage lawyers to “test [their] fortunes with the first jury,” while knowing there will be a “second round in the évent of a ■conviction.” 'McCrory [o. Henderson ], 82 F.8d ■ [1243,] at 1247 [(2d- Cir. 1996) ].’). '
“A third — and perhaps the most fundamental-reason for the proposition that plain-error review not be available to initiate a Batson inquiry on appeal, is the fact that the failure of the trial court to initiate a Batson inquiry simply is not an ‘error,’ plain or otherwise, by the trial court. ‘Error’ (that in turn might be deemed ‘plain error’ in an appropriate case) contemplates a mistake by the court. Specifically, it necessitates a decision by the court that deviates from, a legal rule.
“‘The first limitation, on appellate authority under [the federal plain-error rule,/ is that there indeed be an “error.” Deviation from a legal rule is “error” unless the rule has been waived. For example, a defendant who knowingly and voluntarily pleads guilty in conformity with the requirements of Rule 11[, Fed.R.Civ.P.,] cannot have his conviction vacated by court of appeals on the grounds that he ought to have had a trial. Because the right to. trial is waivable, and because the defendant who enters a valid guilty plea waives that right, his conviction without a trial is not “error.” ’.
“United States v; Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).
*197 “The decision whether to take advantage of the right to generate evidence for consideration by the trial court pursuant to the Batson procedure is a decision for the defendant, not for the trial cowt It is a voluntary decision as to whether to invoke a procedural device that has been made available to defend dants in the trial context. In ⅞⅛ respect, it is not unlike a request for a jury trial itself or a request that the trial judge poll the jurors after a verdict is rendered, or even more, analogous, a failure to conduct voir dire of a. prospective juror. Not requesting it may be a strategic ‘mistake’ by defense cotmsel, but counsel's mistake. is not the trial count's ‘error.’
“The lack of a request by defense counsel for a Batson review might well occur in the context of circumstances more than sufficient to create an inference' of discrimination by the prosecution, yet the law allows for the possibility that defense counsel might have reasons for believing that a particular juror or the jury as a whole is acceptable or even that the jury as selected might be more favorable to his or her client than some entirely new jury chosen from an unknown venire. The fact that counsel intentionally or by oversight fails to use all the procedural devices available to him or her in the Mai context... does not somehow translate into some sort of error, plain or otherwise, on the part of the trial court.
“Put differently, the mere existence, of the condition.that warrants the initiation of a Batson inquiry — a prima fa-cie case of purposeful discrimination — is not the condition that constitutes a reversible error. No criminal conviction has ever been discarded merely because this first step is satisfied, i.e., merely because an inference of discrimination can reasonably be drawn from the circumstances, presented; actual, purposeful discrimination must exist. This .first step and, indeed, the. .entirety of ‘the three-step Batson inquiry’.has been described as ‘ “merely ” a tool for producing the evidence necessary to. the difficult task of “ferreting out discrimination in selections discretionary by nature.” ’ United Stales v. Guerrero, 595. F.3d 1059, 1064 (9th Cir.2010) (Could, J., dissenting) (emphasis added); see also United States v. McAllister, [491 Fed. Appx. 560] (6th Cir.2012) (to same effeet).. As this Court has said, a Batson review ‘shall not be restricted by the mutable and .often, overlapping boundaries inherent, within, a Rafem-analysis framework, but, rather, shall focus solely upon the “propriety of the ultimate finding of discrimination vel non.”' Huntley v. State, 627 So.2d 1013, 1016 (Ato.1992) (emphasis added).
“Thus, the ‘error’ 'that must exist to warrant disturbing the prosecutor’s peremptory strikes is actual, pnrposefid .discrimination in the selection of the jury. It is this aótualpurposeful discrimination then, ' rather than merely a prima facie case for such discrimination, that, must be ‘plain ’ in the trial-court record if we are to provide a defendant ‘who fails to object timely to a prosecutor’s strikes relief' from those strikes on a posttrial basis....
’ "“Finally, it would not be unfair to say that, if a defendant is to have the benefit of a Batson hearing as a tool in assessing whether purposeful discrimination occurred, defense counsel should be required to request, that that tool be employed at the time the jury is struck or soon thereafter. ¡After all, we would be concerned only with that set of cases in which, even under the ‘plain error’ approach employed by the Court of Criminal Appeals in this case, the- dr- *198 cumstances that would ’give rise to an inference of discrimination and thus trigger the right to a Batson hearing would, themselves, be ‘particularly egregious’ and ‘so obvious that the failure to notice them would seriously affect the fairness or integrity of the judicial proceedings-.’” ■ ■
Ex parte Floyd, — So.3d at —— (Mur-dock, J., concurring in the result) (footnotes omitted; emphasis in original).
Further, a review of caselaw indicates that “both the federal and state courts have consistently held that the failure to make a timely [Batson or J.E.B.] objection 'effectively waives any arguments based on improprieties in jury selection 'which the defendant might urge pursuant to Batson.” Brian J. Serr & Mark Maney, Racism, Peremptory Challenges and the Democratic Jury: The Jurisprudence of a Delicate Balance, 79 J.Crim. L. and Criminology 1, 19 (1988). The Eleventh Circuit has explained:
“In United States v. Rodriguez, 917 F.2d 1286 (11th Cir.1990), this court recognized that the 'Supreme Court’s Bat-son [v. Kentucky, 476 U.S. 79 (1986),] analysis envisioned a ‘timely objection’ and thus held that ‘an inquiry into the government’s exercise of its peremptory challenges is initiated by a defendant’s timely objection.’ Rodriguez,- 917 F.2d at 1288 n. 4. The failure to make a timely Batson objection results in a waiver of the claim.”
United States v. Cashwell, 950 F.2d 699, 704 (11th Cir.1992).
Like the Eleventh Circuit, other federal circuits have arrived at similar holdings. For example, in McCrory v. Henderson, 82 F.3d 1243 (2d Cir.1996), the Second Circuit wrote that, “[i]n view of the problems of responding to, ruling on, and remedying belated Batson challenges, we hold that the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection waives the objection.” 82 F.3d at 1249. Similarly, the Fifth Circuit, in Wilkerson v. Collins, 950 F.2d 1054 (5th Cir.1992), wrote that the petitioner’s “failure to timely object at trial is a constitutional bar to his Batson challenge.” 950 F.2d at 1063. Likewise, in United States v. Chandler; 12 F.3d 1427 (7th Cir.1994), the Seventh Circuit explained that “[a] defendant who suspects that a prosecutor’s peremptory challenge to a venireperson is motivated by racial discrimination must make a timely objection to the challenge.” 12 F.3d at 1430-31, Finally, in United States v. Clark, 409 F.3d 1039 (8th Cir.2005), the Eighth Circuit held that a “gender-based Batson challenge,” not made “until after the venire had been dismissed,” was waived. 409 F.3d at 1043.
Here, White failed to raise his J.E.B. objection at trial. Therefore, this issue does not appear to be properly before this Court for review. However, even if a J.E.B. issue were subject to plain-error review, "White is not entitled to any relief.
“To find plain error in the context of a Batson or J.E.B. violation, the record must supply an inference that the prosecutor was ‘engaged in the practice of purposeful discrimination.’ ” Blackmon v. State, 7 So.3d 397, 425 (Ala.Crim.App.2005) (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987)). See also Saunders v. State, 10 So.3d 53, 78 (Ala.Crim.App. 2007) (“For an appellate court to find plain error in the Batson [or J.E.B.] context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges.”).
In evaluating a Batson or J.E.B. claim, a three-step process must be followed. As explained by the United States
*199 Supreme Court in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
“First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96 — 97[, 106 S.Ct. 1712, 1723 (1986)]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether - the defendant has shown purposeful discrimination. Id., at 98.”
537 U.S. at 328-29.
With respect to the first step of the process — the step at issue here— “[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.” Ex parte Brooks, 695 So.2d 184, 190 (Ala.l997) (citing Ex parte Branch, .526 So.2d 609, 622 (Ala.1987)). “A defendant makes out a prima facie case of discriminatory jury selection by ‘the totality of the relevant facts’ surrounding a prosecutor’s conduct during the defendant’s trial.” Lewis v. State, 24 So.3d 480, 489 (Ala. Crim.App.2006) (quoting Batson, 476 U.S. at 94, affd, 24 So.3d 540 (Ala.2009). “In determining whether there is a prima facie case, the court is to consider ‘all relevant circumstances’ which could lead to an inference of discrimination.” Ex parte Branch, 526 So.2d at 622 (citing Batson, 476 U.S. at 93, citing in turn Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). In Ex parte Branch, the Alabama Supreme Court specifically set forth a 'number of “relevant circumstances” to consider in determining whether a prima facie case of race discrimination has been established:
“The following are illustrative of the types of evidence that can be used to raise the inference <j>f discrimination:
“1. Evidence that the ‘jurors in question share[d] only this one characteristic — their membership in the group— and that in all other respects they [were] as heterogeneous as the community as a whole.’ [People v.] Wheeler, 22 Cal.3d [258] at 280, 583 P.2d [748] at 764, 148 Cal.Rptr. [890] at 905 [ (1978) ]. For instance ‘it may be significant that the persons challenged, although all black, include both men and women and are a variety' of ages, occupations, and social or economic conditions,’ Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
“2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
“3. The past conduct of the state’s attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ].
“4. The type and' manner of the state’s attorney’s questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at. 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
“5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
*200 “6. Disparate treatment of members of the jury venire with the- same characteristics, or who janswer a question, in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
“7. Disparate, examination .of members of the venire; e.g., in Slappy, a question, designed to, provoke a certain response that is. likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
“8., Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. [229] at 242, 96 S.Ct. [2040] at 2049 [ (1976) ].
“9. The state used peremptory challenges to 'dismiss all or most black jurors. See Slappy, 503 So.2d at 854, Turner, supra.”
Id. at 622-23. In Ex parte Trawich, 698 So.2d 162 (Ala.1997), the Court reiterated the Ex parte Branch factors in a manner applicable to gender as follows:
“(1) evidence that the jurors in question shared only the characteristic of gender and “were in all other respects as' hete-rogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct , of the state’s attorney in. using peremptory challenges to strike members of one gender; (4) the type and manner of the state’s questions and statements' during voir dire; (5) the type and manner .of questions directed to the '.'challenged juror, including a lack-of questions; - (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the Stat;e used all or most of its strikes against members of one gender.”
698 So.2d at 168.
Here, the State used 12. of its, 14 peremptory- strikes to remove female venire-members. Thereafter, White’s jury consisted of 5. women and 7 men. Also, a female and a male served as alternate jurors. At the conclusion of voir dire, defense counsel did not indicate and the circuit court did not believe that a J.E.B. violation had occurred. The circuit court asked both sides whether they- had anything to say, and defense counsel responded: “The defense is satisfied, Your Hon-- "or.” (R.208.)
Now,, on appeal, White- argues for the first time that the State’s use of 12 of its 14 peremptory strikes, including the last 9 in a row, to remove women establishes a prima fade ease that the. State used its strikes to discriminate against women. This Court disagrees., The use of 12 of 14 peremptory strikes against women does not raise an inference that the State purposefully discriminated against women. See Ex panto Land, 678 So.2d 224, 246 (Ala.1098) (holding that the State’s use of 11 of its 14. peremptory strikes against whites did not raise a inference that the State purposefully discriminated against whites); Ex ponte Trawick, 698 So.2d at 167 (holding that the State’s “use[ ] [of] 11 of its 14 peremptory strikes to remove women from Trawiek’s jury, resulting in a petit jury that was composed of 7 men and 5 women’-’ -did not raise an inference that the State discriminated' against women). Nor does-the State’s use of its last 9 peremptory strikes against women estab *201 lish that there was a pattern to the State’s use of its strikes. McCray v. State, 88 So.3d 1, 19 (Ala.Crim.App.2010) (holding that the State’s use of its last 7 strikes against women did not establish a pattern). Further, the number of strikes the State used against women' is tempered by the fact that 5 jurors and 1 alternate were women. See McCray v. State, 88 So.3d 1, 24 (Ala.Crim.App.2010) (“ ‘ “Of course, the fact that [women] are ultimately seated on the jury does not necessarily bar a finding of discrimination under Batson [or J.E.B.,] see [United States v.] Battle, 836 F.2d [1084,] 1086 [(8th Cir.1987) ],'but the fact may be taken into account in a review of all the circumstances as one that suggests that the government did not seek to rid the jury of persons who shared the [same gender].” United States v, Young-Bey, 893 F.2d 178, 180 (8th Cir.1990)’ ” (quoting Mitchell v. State, 579 So.2d 45 (Ala.Crim.App.1991), quoted with approval in Ex parte Thomas, 659 So.2d 3, 7 (Ala.1994)) (emphasis omitted)). Accordingly, the State did not use “peremptory challenges to dismiss all or most [female] jurors.” Ex parte Branch 526 So.2d at 62S.
Further, there is nothing in the record to indicate that the prosecutor had a history of discriminating against women. The type and manner of questions asked during voir dire were general and not directed toward women. In fact, the State asked questions of the entire venire, then asked follow-up questions of both men and women when appropriate. Additionally, the State did not single out women for individualized vóir dire; rather, all potential jurors (men and women) who had given answers that raised concerns where questioned individually.
White, however, argues that the State treated female potential jurors differently because it struck a female potential juror,L.K., who had been charged with domestic violence but allowed two male potential jurors, D.G. and A.D., to serve on the jury, although they had been charged with two counts of domestic violence and underage drinking, respectively. White further argues that the. State struck females who had friends.or family members.who had been charged,with crimes while failing to strike similarly situated ipales. Specifically, White argues that the State struck potential jurors N.B., R.G., T.S., F.J., and L.H., all females who had family members that had been charged with a crime, but did not strike D.G.,,AD., and J.C., males who themselves had been charged with a crime or who had family members .who had been charged with a crime.. White goes on to argue that the State. targeted women with children under the age of 19 while allowing men with children under 19 to serve on the jury. To support his argument, White asserts that the State struck L.K., N.B., P.D., T.S., F.J., and L.G., all females with children under the age of 19, while allowing J.G., A.D., and D.J., similarly situated males, to serve on the jury. Filially, White argues that the State struck S.C., a female potential juror who answered only one question during voir dire, while allowing T.G. and F.O., male potential jurors who answered only one question during voir dire, to serve on the jury.
White’s argument is not supported by the record. The record establishes that the State struck both men and women who had family members who had been charged with crimes. Although the State allowed some men who had a family member who had been charged with a crime to serve on the jury, it. also allowed B.S., a female who.had á family member charged with a crime, to serve on the jury. White’s argument that the State targeted female potential jurors with children under the age of 19 while -.allowing similarly situated males to- serve on the jury is also belied by the record. Although the State *202 did not strike 3 male potential jurors with children under the age of 19, it also allowed E.K., a similarly situated female juror, to serve. Further; E.S., the female alternate juror:, had a child under the age of 19. Finally, although the State struck S.C., a female potential juror who answered only one question during voir dire, it also struck C.H., a male potential juror who answered only one question. Thus, contrary to White’s assertion, the State struck and allowed men and women to serve who had family members who had been convicted of a crime, who had children under the age of 19, and who answered only one question during voir'dire. Accordingly, disparate treatment is not “obvious oh the face of the record.” Ex parte Walker, 972 So.2d 737, 753 (Ala. 2007).
Finally, White argues the prosecutor targeted female potential jurors by asking the veniremembers whether they felt that a handsome defendant could not have done the acts with which White was charged. According to White, the “comments indicate[d] that the prosecution believed female jurors could not be impartial in a case involving charges of capital murder and rape against an attractive male defendant.” • (White’s brief, at 63-64.) This Court disagrees.
During voir dire, the State asked the following:
“Now, do any of you think looking at the Defendant in this case, Justin White, that he just looks too nice of a guy to have done something like we’re talking about in these indictments?”
(R. 80-81.) After receiving no response, the State asked:
“I mean,- does anybody right now just say, I just 'don’t'believe it, right off the bat, this is not what you would think about a guy that looks like that, handsome guy, well dressed?
“I just, right now, I want to tell you I just don’t believe that he did it; does anybody feel that way?” •'
(R. 81.)
Contrary to White’s assertion, these two questions did not “indicate that the prosecution believed female jurors could not be impartial in a case involving charges of capital murder and rape against an attractive male defendant.” (White’s brief, at 63-64.) Rather, these questions were designed to elicit responses from any potential juror (male or female) who might have felt that a nice-looking, well dressed individual like White would not have committed the horrendous acts with which he was charged.
In sum, the State’s number of peremptory strikes against women does not raise an inference of discrimination. In fact, neither the circuit court nor defense counsel believed that a J-.E.B. violation had occurred. And nothing in the record — from the type and manner of questions asked to the State’s use of its strikes — indicates that the State treated women disparately. Accordingly, this Court cannot say that plain error resulted from the circuit court’s failure to. sua sponte require the State to give its reasons for striking female potential jurors. Therefore, this issue does not entitle White to any relief.
V.
White next argues that, during its guilt-phase closing argument, the State im-permissibly asserted that the jury could consider Rule 404(b), Ala. R. Evid., evidence to establish White’s bad character for feeling no remorse. Specifically, White argues that the State improperly used the fact that he showed no remorse for killing Black to establish that he murdered Parker. White failed to raise this objection at trial; therefore, this issue will be reviewed *203 for plain error only. Rule 45A, Ala. R.App. P.
This Court has explained:
“ While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ]_ ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).”
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990) (emphasis omitted).
“ ‘The prosecutor’s duty in a criminal prosecution is to seek justice, and although the prosecutor- should prosecute with vigor, he or she should not use improper methods calculated to produce a wrongful conviction.’ Smith v. State, [Ms. CR-97-1258, December 22, 2000] :— So.2d -, - (Ala.Crim.App. 2000), affd in pertinent part, rev’d on other grounds, [Ms. 1010267, March 14, 2003] — So.2d - (Ala.2003). ‘In reviewing allegedly improper prosecuto-rial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). “Prosecutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.” ’ Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir. 1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).”
Minor v. State, 914 So.2d 372, 415 (Ala. Crim.App.2004). In addition:
“ ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’Bankhead [v. State], 585 So.2d [97,] 107 [(Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument' to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bankhead, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that - court is *204 .given broad discretion in determining what is permissible argument.’ . Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id,”
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Grim.App.2000), affd, 814 So.2d 970 (Ala.-2001).
During his guilt-phase ‘closing argument, the prosecutor stated:
“What did [White] say in that statement that he gave Detective Robinson, in the Bessemer case?
“He said, it’s kind of hard to explain how I -like it. When I’m. with a girl, I like to put my hands around her neck.
“Yeah, that is kind of hard to explain. But that is the way he likes it. That’s his MO. That’s what he does. It wasn’t spontaneous. It wasn’t something that just happened. This was not an accident. ■' •
“That’s what Sierra Black’s case tells you about Jasmine Parker’s case.
“When you listen to his statement in Sierra Black’s case. It tells you everything you need’ to know about Justin White. Everything.
“Did he show any remorse whatsoever? Other than for himself?
“The only time he teared up, was when he started talking about what was going to happen to him. He never said I feel bad for what happened to Sierra. It’s all about him.”
(R. 587-88.)
As stated above, evidence establishing that White raped and murdered Black was admissible under Rule 404(b), Ala. R.Crim. P., to establish his identity as the individual who raped and murdered Parker. Because White’s actions in raping and murdering Black were admissible to establish his identity, the evidence relating to facts underlying Black’s rape and murder and the circumstances of that crime were admissible. Jones v. State, 915 So.2d 78, 83 (Ala.Crim.App.2005). The. prosecutor’s comment about White’s lack of remorse was not, as White argues, an improper comment on his bad character.. Instead, the prosecutor’s comment related to evidence — White’s lack of remorse for killing Black — tending to establish that White intentionally murdered Black. See Darby v. State, lib S.W.3d 714, 721 (Tex.App.2004) (holding that the jury may infer intent to kill from the defendant’s lack of remorse). Because the prosecutor’s comment related to evidence establishing White’s intent to murder Black, no error, much less plain error, occurred.
Moreover, even if the prosecutor’s comment was improper, it did not “so infect[ ] the trial with unfairness as to'make the resulting conviction-a denial of due process.” Minor, 914 So.2d at 415. The prosecutor’s statement was isolated and made in the heat of debate. See Smith v. State, 795. So.2d 788, 826 (Ala.Crim.App.2000) (holding that the “isolated statement by the prosecutor [did not] so ‘infect[ ] the trial with unfairness’ that.Smith was denied due process”). Further, the jury was repeatedly instructed that it could not consider White’s involvement in the Black murder to infer his bad character. See Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008) (quoting Cochran v. Ward, 935 So.2d 1169, 1176 (Ala.2006)) (“[A]n appellate court ‘presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.’”). In addition to the circuit court’s instructions, the prosecutor informed the jury that it could not use the evidence of White’s other crimes or bad acts to infer bad character. Additionally, the State presented overwhelming evidence establishing that White raped and murdered Parker, including DNA from his *205 semen on her body and DNA on a cigar tip placing him in Parker’s apartment at the time of the crime. The State also presented evidence establishing that White raped and murdered another woman in a similar manner less than four months later.
Based on the forgoing, this Court cannot say that the’prosecutor’s comment “so infected the'trial with unfairness as to make the resulting conviction a denial of due process.” Minor, 914 So.2d at- 415. Accordingly, .this issue does not rise to the level of plain error. Rule 45A, Ala. R.App. P.
VI.
White next argues that the circuit court erroneously allowed the State to introduce victim-impact evidence during the guilt phase of the trial. Specifically, White argues that the State improperly admitted a recording of the telephone call Vanessa Parker made to emergency 911 after finding her daughter’s lifeless body. According to White, the 911 call was full of emotional statements and pleas for help and thus constituted-inadmissible victim-impact evidence. White further argues that the State improperly capitalized on the emotional 911 call during its closing argument. According to White, the admission of the 911 recording requires that his conviction be reversed. White did not raise this argument at trial; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
During the guilt phase, the State admitted a recording of the telephone call Vanessa Parker made to emergency 911 after finding her daughter’s body. -Vanessa Parker was clearly upset as she asked for help. Thereafter, - during the State’s guilt-phase closing argument,- the prosecutor acknowledged the emotional nature of this case and asked the jury not to consider emotion but, instead, to rely only on the evidence. Specifically, the prosecutor stated:
“Ladies 'and gentlemen, ... this case involves passion. ■ Anytime you have a murder case. Especially a young 17 year-old girl. The'only daughter of a single mother. Who’s working trying to raise that child by herself. No other children. Is murdered.
“And ho't just murdered. But strangled to death. Raped in their own apartment. And Vanessa has to come home and find that.
“Will she ever get that picture out of her head? I don’t think so. How can you?
“And you understand the emotion that she feels because you heard that 911 tape. It just tears you up inside.
“But, when you go back to that.jury room it’s not about.passion any more, Because passion,can only take you so far. What it’s about when you get back there, is about the evidence.
(R. 582-83) (emphasis added.)
“Victim-impact statements typically ‘describe the effect of the crime on the victim and his family.’” Turner v. State, 924 So.2d 737, 770 (Ala.Crim.App.2002) (quoting Payne v, Tennessee, 501 U.S. 808, 821, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). “It is well settled that victim-impact statements ‘are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no-probative value on any material question of fact -or inquiry is inadmissible.’ ” Jackson v. State, 791 So.2d 979, 1011 (Ala.Crim.App.2000)- (quoting Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993), citing in turn Charles W. Gamble, McElroy’s Alabama Evidence § 21.01 (4th ed.1991)). This Court has explained that evidence relating to the discovery of the *206 victim’s body is not victim-impact evidence. Turner, 924 So.2d at 769-70. See also Gissendanner v. State, 949 So.2d 956, 965 (Ala.Crim.App.2006) (holding that evidence relating to the discovery of the victim’s body did not constitute victim-impact evidence).
Here, the recording of the call Vanessa Parker made to emergency 911 after finding her daughter’s lifeless body was relevant to the discovery of Parker’s body, the timing of the murder, and how the police became involved in investigating the murder. Accordingly, the recording did not constitute victim-impact evidence.
Further, the prosecutor did not, as White argues, capitalize on the emotional 911 recording. Instead, the prosecutor acknowledged that this case involves emotional facts and evidence, including the 911 recording, and correctly informed the jury that it should not consider passion or emotions. Rather, according to the prosecutor’s statement, the jury should focus on the evidence.
Because the 911 recording did not constitute victim-impact evidence and because the prosecutor did not argue that the jury should consider the emotional nature of the recording, this issue is without merit. Accordingly, it does not entitle White to any relief.
Moreover, even if the 911 recording and the prosecutor’s statement did constitute impermissible victim-impact evidence and argument, this Court holds that the error does not rise to the level of plain error. In Ex parte Rieber, 663 So.2d 999 (Ala.1995), the Alabama Supreme Court held:
“We agree with Rieber that Mr. Craig’s testimony concerning Ms. Craig’s children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568 (Ala. Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181 (Ala.1992), cert. denied, [509] U.S. [929], 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, [581 So.2d 1159 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.1991) ]; Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant, [555 So.2d 235 (Ala.1989) ], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber’s attorneys did not object to Mr. Craig’s brief references to Ms. Craig’s children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor- had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that *207 the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after- examining the record 'in- its. entirety,.we conclude that the aforementioned portions of Mr. Craig’s testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. .It would elevate form over substance for us to hold, based on the record before us,, that Rieber- did not receive a fair trial simply because the jurors were told what they probably had already suspected — that Ms. Craig was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).”
663 So.2d at 1005-06.
As in Rieber, the -jurors in this ease did “not leave their common sense at the court house door.” Id. Instead, they were well aware that Parker was not a ‘“human island,’ but a* unique individual whose murder had inevitably had a profound impact on her [mom].... ” Id. Both the prosecutor and defense counsel informed the jury that it could not consider emotion but instead should consider only the evidence. Thereafter, the circuit court instructed the jury that its verdict should not be based upon prejudice, sympathy, compassion, or any other emotion.
After reviewing the record as a whole, this Court finds no indication that the recording or argument affected the outcome of- the trial or that either otherwise prejudiced White’s - substantial rights. Accordingly, this issue does not rise to the level of plain error. Rule 45A, Ala. R.App. P.
VII.
White next argues that the circuit court erroneously prohibited him from eliciting evidence highlighting a deficiency in the investigation of Parker’s rape/murder. According to "White, “[b]y motion in limine, the State sought to prevent the defense from questioning officers involved in the Jasmine Parker investigation about their knowledge . of an individual named ‘[W]heezy’ who allegedly expressed an intent to kill Ms. Parker over drugs.” (White’s brief, at 73.) White asserts that the State claimed that Wheezy’s statement was hearsay and thus was inadmissible. According to. White, “the defense explained that it would not seek to admit this evidence for the truth of the matter asserted, but ‘to cross-examine the State’s witnesses concerning the investigation and the work that [they] did ... in this case.’ ” (White’s brief, at 73.) White then asserts that, “[notwithstanding this nonhearsay basis for the admission of this evidence, the trial court granted the State’s motion to exclude the evidence as hearsay.” Id. White then argues that, “[b]y preventing Mr. "White from using this evidence for a critical, nonhearsay purpose, the trial court violated Mr. White’s fundamental right to present a complete defense.” Id. White’s argument does not accurately reflect the circuit court’s ruling and is without merit.
Before trial, the State orally moved the circuit court to prevent White from eliciting hearsay statements indicating that a person named Willy Tate had filed a police *208 report stating that he had heard another individual named “Gankman” say that another individual named “Wheezy” said that he was going to kill Parker because she stole marijuana from him'. (R. 17.) Thereafter, the following Occurred:
“[Prosecutor]: The second motion I would make. Your Honor, is in regards to — it’s basically a Motion In Limine in regal’d to some hearsay that the defense may try to introduce into the case. And the detective’s notes and a police report.
“There is a report by an individual naméd Willy Tate, who goes 'to the police and tells them that he heard another individual by the 'name of Gankman talking about a guy' named ‘Wheezy’, who had his marijuana stolen by Jasmine. And Wheezy said' that he was going to kill Jasmine.
“And there’s double and triple hearsay in there. And we would just ask that the defense not be allowed to introduce that evidence, unless, it is through a person that would not violate the hearsay rule.
“THE COURT: Response?
[[Image here]]
“[Defense-counsel]: To the extent that we — I don’t want .to limit our ability to cross-examine the State’s witnesses concerning the investigation and the work that he did — the State’s witnesses did in this case.
“I don’t want to be limited in the questions that I can ask concerning his investigation of this ‘Mr. Jones,’ and ‘Gankman’. and such other people. I believe we would be entitled to ask those questions' should we desire to.
“[Prosecutor]: Well, Judge, that is obviously my objection in regard to- how that is asked. If, like I said, the evidence as I understand it is coming from one witness, Willy Tate. He’s talking about somebody told him about what another person said.
“THE COURT: Do y’all get that part? ■ He said, hearsay, he objects to the 'hewrsay nature of it?
“[Prosecutor]: So I don’t want them to ask the Detective, didn’t Witty Tate tell you that Omlmcm said that Wheezy was going to kill Jasmine. They emt produce my mimesses to that effect—
“THE COURT: All right. I’ll grant that motion.”
(R. 17-19) (emphasis addéd.)
As the above-quoted portion of the record shows, the circuit court did not, as White asserts, prevent him from using Tate’s police report for the nonhearsay purpose of questioning the police regarding' the adequacy' of their investigation. To the contrary, the State objected only to 'defense counsel’s using the statement in the report for the truth of the matter asserted, i,e., asking “the Detective, didn’t Willy Tate tell you that Gankman said that Wheezy was going to kill Jasmine.” (R. 19.) Thereafter, the circuit court granted the" State’s motion preventing defense counsel from using the Tate report for héarsay purposes. Nothing in the State’s argument or the circuit court’s ruling indicated that defense counsel could hot have used the report for the nonhearsay purpose of trying to attack the State’s investigation into all suspects.
Because the circuit court did not prevent defense counsel from using the Tate police report to attack the adequacy of the State’s investigation into all possible suspects, White’s argument to the contrary is refuted by the record. See Albanran v. State, 96 So.3d 131, 160 (Ala.Crim.App.2011) (recognizing that claims that are refuted by the record are without merit); McNabb v. State, 991 So.2d 313, 320 (Ala. Crim.App.2007) (holding that a claim that is refuted by the record is without merit *209 and does not entitle the appellant to relief). Consequently, this issue is without merit and does not entitle White to any relief.
vm.
White next argues that the State improperly argued facts not in evidence. According to White, the prosecutor improperly argued that the semen on Parker’s leg had to have been left, the day of the murder because otherwise she would have washed it off. White also argues that the prosecutor improperly stated that White confessed to raping Black.' White asserts that the State did not present any evidence indicating that Parker washed herself the day of the murder; therefore, its argument that she would have washed the semen off was unsupported by facts in evidence. He further argues that he never confessed to raping Black; therefore, the prosecutor’s unsubstantiated factual assertion requires that his conviction by reversed. White did not raise these objections at trial; therefore, this Court reviews these issues from plain error, only. Rule 45A, Ala. R.App. P,
“ ‘During, closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference,’” Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000) (quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988), abrogated by Bethea v, Springhill Mem’l Hosp., 833 So.2d 1 (Ala.2002)). “ ‘ “A prosecutor as well as defense counsel has a right to present his impressions from the evidence,” and “[h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way.”’” Sneed v. State, 1 So.3d 104, 140 (Ala.Crim.App.2007) (quoting Henderson v. State, 584 So.2d 841, 856-57- (Ala.Crim.App.1988), quoting in turn Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980)).
Further, as discussed in Section V of this opinion,
“ ‘[w]hile this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d [1106,] at 1111 [(Ala.1985)]_ ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).”
Kuenzel v. State, 577 So.2d at 489 (emphasis omitted).
“ ‘The prosecutor’s duty in a criminal prosecution is to seek justice, and although the prosecutor should prosecute with vigor, he or she should not use improper methods calculated to produce a wrongful conviction.’ Smith v. State, [Ms. CR-97-1258, December 22, 2000] — So.2d -, - (Ala.Crim.App. 2000), aff'd in pertinent part, rev’d on other grounds, [Ms. 1010267, March 14, 2003] — So.2d — (Ala.2003). ‘In reviewing allegedly improper prosecuto-rial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in. the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). ‘ “Prosecutorial misconduct is a basis for *210 reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.” ’ Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial’ with unfairness as to make the resulting conviction a denial of due process.’ Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).”
Minor v. State, 914 So.2d at 415. In addition:
“ ‘in judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a ,denial of due process.” ’ Bankhead [v. State], 585 So.2d [97,] 107 [(Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 528 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bank-head, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion- in determining what is permissible argument.’ Bankhead, 585 So.2d at 105.' We will not reverse the judgment of the trial court unless there has been an abuse of that discretioh. Id.”
Ferguson v. State, 814 So.2d at 945-46.
A.
White asserts that the prosecutor erroneously argued facts not in evidence when the prosecutor stated that White confessed to raping Black. Specifically, White argues that the following portion of the prosecutor’s closing argument constitutes reversible error:
“The fact that he confessed to raping Sierra Black. The fact that he confess.ed to holding her down, and she would come up, and boom. He hit her head on the edge of the table again.”
(R. 557.) White contends that he never confessed to raping Black; therefore, the prosecutor improperly argued facts not in evidence. This Court disagrees.
Although in his confession White never said that he raped Black, he did confess to facts establishing that he raped Black. White, while confessing to murdering Black, described having sex with Black as follows:
“[White]: She pretty much came over and we had sex and it was a little too rough and I got a little too carried away and I got to the point where we was;' during the rough sex I was too rough with her neck and I hit.her, accidentally hit her head up against the wooden table I had in that sectional [couch].
[[Image here]]
“Detective: Um so when she hit her head what happened?
*211 “[White]: Um she; -pretty much we just ... I could tell that something was wrong with her.... after that second time she hit her head.
“Detective: So she hit it twice.
“[White]: Yeah.
“Detective: Okay.
“[White]: The first time it wasn’t that big of a bump. But then the second time, '
“Detective: Did she holler?
“[White]: She was like ‘ahhhh’ and she ’ kept holding the back of her head. I was like what the f* *k? And then she started dazing out. I was like what the f**k is'going oh? And so I’m like freaking out. I’m like what the f* *k? And you know I was holding her neck too, too hard and ... I could tell she couldn’t breathe. And the next , thing I know she had just passed out. I was like oh she’s f* * * * * ⅜ dead and I’m like, I’m •..
“Detective: Did you finish? I mean were y’all through ... with the sex?
“[White]: I mean ... ..we was, we was still going and I stopped and I was like oh s* *t.”
(C. 290-92.) -
Although White denied that he raped Black, a reasonable inference from White’s description of the events leads to the: conclusion of rape. Specifically, White explained the he hit Black’s head twice and held her neck until she passed out but was, in relation to the sex, “still going.” (C. at 292.) From the facts as described by White during his interview, the State reasonably inferred that White confessed to raping Black. Therefore, this issue is without merit.
B.
Next, White argues that the State improperly argued facts not in evidence when he stated that White’s semen found on Parker’s leg must' have been left there the day of the murder because otherwise she would have washed it off. During closing argument, the State argued:
“They had sex- that day that he was there, that we can put him there. On July 11th. If they had sex 'any other time before then. That semen on her leg would have washed off. She would have taken a shower in the morning.” *213 1986) (quoting Tucker v. State, 474 So.2d 181, 132 (Ala.Cr.App.1984), rev’d on other grounds, 474 So.2d 134 (1985)). The officers related information obtained from other sources to explain why they proceeded as they did. This was not hearsay. See, e.g., Brannon [v. State ], 549 So.2d [582] at 539 [ (Ala.Crim.App.1989)]; McCray v. State, 548 So.2d 678, 576 (Ala.Cr.App.1988). See, also, Molina v. State, 533 So.2d 701, 714 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1647, 103 L.Ed.2d 851 (1989); Tillis v. Stats, 469 So.2d 1367, 1370 (Ala.Cr.App.1985).”
*211 (R. 554-55.) According to White, there was no evidence indicating that Parker showered the day of her murder; therefore, the prosecutor’s comment requires his conviction to be reversed. This Court disagrees.
Although there was no evidence indicating when Parker showered last, the State did not argue that she did, in fact, take a shower. Rather, the State argued that if the semen • had been left • on Parker on some day other than the day of the murder, she would have washed it off. Thus, the State asked the jury to assume that Parker showered at some point.
Further, the circuit court emphasized during its jury instruction that the jury could consider only evidence presented at trial and could not consider facts not supported by evidence. The; circuit court instructed the jury that the evidence comes from the witness stand and that what the lawyers say is not evidence. See Ex parte Belisle, 11 So.3d at 333 (“[A]n appellate court (presume[s] that the jury follows the trial court’s instructions' unless there is evidence to the contrary.’ ” (quoting Cochran v. Ward, 935 So.2d at 1176)).
Further, the State presented other evidence from which the jury could have inferred that White was with Parker and left his semen on her on the day she was murdered. Cf. McNabb v. State, 887 So.2d 929, 971 (Ala.Crim.App.2001) (holding that “testimony that may be inadmissible may *212 be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred”). The State presented. evidence indicating that Parker was wearing jeans the day she was murdered that would have rubbed away any semen left on her leg a previous day. Further, the State presented evidence establishing that between 3:00 p.m. and 7:30 p.m. on July 11, Parker struggled with an attacker in her apartment, was stripped of her jeans and panties, and was strangled to death with those jeans. During the same period, White was in Parker’s apartment and smoked a cigar.[6] Additionally, the State presented evidence establishing that White raped and murdered another women in a very similar mariner less than four months later.
Because the State did not say that Parker did take a shower, because the circuit court instructed the jury that attorneys’ statements are not evidence and that it could consider only evidence, and because the argument that White left the semen on the day of the murder could have been inferred from other. evidence,, this Court cannot say that the State’s argument, which was delivered in the heat of debate, “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Minor, 914 So.2d at 415 (citations and quotations omitted). For the same reasons, “this Court cannot say that the prosecutor’s ... comment had an ‘unfair prejudicial impact on the jury’s deliberations.’ ” Wilson v. State, 142, So.Sd 732, 751 (Ala.Crim.App.2010) (quoting Em parte Brown, 11 So.3d 933, 938 (Ala.2008)). Accordingly, White has not established that this alleged error rises to, the level of plain error. Rule 45A, Ala. R App. P.
IX.
White next argues that the circuit court erroneously allowed the pathologist to testify to inflammatory hearsay statements concerning whether -sexual assault occurred. Specifically, White argues that the circuit court erroneously allowed Dr. Gregory Davis, a forensic pathologist with the Jefferson County Coroner’s Office, to testify to the opinion of another nontestify-ing individual’s opinion that there was likely a sexual-assault component to this case. According to White, Dr. Davis’s testimony constituted inadmissable hearsay and violated his Sixth Amendment right to confront the witnesses, against him. This Court disagrees.
“ ‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala. R. Evid. “It is clear that the hearsay rule applies only to a statement offered for the truth* of its contents.” Edwards v. State, 502 So.2d 846, 848-49 (Ala.Crim.App.1986) (citations omitted). “A statement offered for a reason other than to establish the truth of the matter asserted therein is not, hearsay.” Deardorff v. State, 6 So.3d 1205, 1216 (Ala.Crim.App.2004) (citing Smith v. State, 795 So.2d 788, 814 (Ala.Crim.App.2000)). In Sawyer v. State, 698 So.2d 1035 (Ala.Crim, App.1992), this Court explained:
“‘A statement may be- admissible where it is not offered to prove the truth of whatever facts might be stated, “but rather to establish the reason for action or conduct by the witness [when the reason for the action or conduct is relevant to an issue at trial].” ’ Edwards v. State, 502 So.2d 846, 849 (Ala.Cr.App.
*213 598 So.2d at 1038. See also Miller v. State, 687 So.2d 1281, 1285 (Ala.Crim.App.1996) (“The officers’ testimony in this ease was received to show the-reasons fop the officers’ actions and how their investigation focused on a suspect.”).
Similarly, “[t]he -[Confrontation] Clause ... does not- bar the use of testimonial statements for purposes other than -establishing the- truth of the matter asserted.” Crawford v. Washington, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)). As the Supreme Court of the United States has held, “the Confrontation Clause ... has no application to out-of-court statements that are not offered to prove the truth of the matter asserted.” Williams v. Illinois, — U.S. -, -, 132 S.Ct. 2221, 2228, 183 L.Ed.2d 89(2012).
Here, the record .establishes that Dr. Davis’s testimony was not offered for the truth -of the matter asserted; therefore, it was not inadmissible hearsay and did not implicate the Confrontation Clause. At trial, Dr. Davis testified that he initially did not find any sperm during his examination of the biological material collected from Parker’s body. Accordingly, his findings were that there was no sperm. Later, however, Dr. Davis’s findings changed. While explaining why his. findings changed, the following occurred: - ,
“[Dr. Davis]: Ms. Parker died in July of 2006. And 1 looked at the slides initially in July of 2006.
. “Actually, I was. not the only person involved in this ease. We had someone who was in training with us, at the time. He was — he was in training for forensic pathology the way that I had been, years ago in San Diego.
“So he looked at the slides in July of 2006. He did not see any sperm. I looked at the slides in July of 2006,1 did not see any sperm.
“But in November of 2006, Owen— Owen Middleton is the pathologist who was in training with- us. It bothered him, because it seemed clear that there was likely a component of sexual assault in this case—
“[Defense counsel]: I’m going to object. If he’s going to testify as to the opinion of another person, Judge. It appears that that’s what he is doing, at this time.
“[Prosecutor]: Judge, he’s not testifying to the truth , of the matter asserted, but to show wh/y he did what he did next.
“THE COURT: Overruled. Go ahead.
“[Dr. Davis]: Okay.
“So Dr. Middleton looked at the slides again. Detected sperm this time, few and pale, but present.
“I then looked at the slides. I also saw. the sperm the second time when I looked at the slides in November of 2006.
“As soon as I realized sperm were there to be seen,; I contacted Detective Bristow.' .-And the- following day I *214 talk[ed]- with Detective Anderson with the Police Department.- To let them know that we had now seen sperm. So that part of our examination and findings had changed. "And we wanted them to know that.
“(Brief pause.)
“THE COURT: Okay,-’Ladies and gentlemen. What the witness just said, the other gentleman found on his review of the slides. You cannot accept that for the truth of that matter.
“You can only consider that testi’mony to understand why they did what they did follomng that. What they did next, okay. Can y’all do that?
“(No verbal response.)
“THE COURT: Very good. Go ahead.”
(R. 320-22) (emphasis added).
Here, it is obvious from the record that Dr. Davis’s testimony relating to Dr. Middleton’s opinion was not, as White argues, offered for the truth of the matter asserted. Rather, it was offered to show why the biological samples were examined a second time and why Dr. Davis’s finding changed. Accordingly,'White’s argument that Dr. Davis’s testimony constituted inadmissible hearsay and violated the Confrontation Clause is without merit. See Sawyer, 598 So.2d at 1038; Crawford, 541 U.S. at 59 n. 9; Street, 471 U.S. at 414.
•X.
White next argues that the circuit court impermissibly allowed the State to introducé DNA evidence linking White to Parker’s rape/murder because the State failed to establish a complete chain of custody: Specifically, White argues that the State failed to establish the chain of custody for DNA from the cigar tip collected at Parker’s apartment and for DNA from the biological material collected from her body because the State failed to establish to whom these items were given at the DFS and because the State failed to establish that the items were in the same condition when tested as they were when they were collected. WTiite failed to challenge the chain of custody below; therefore, this Court reviews this issue-for plain error only. Rule 45A, Ala. R.App. P.
The Alabama Supreme Court in Ex parte Holton, 590 So.2d 918 (Ala. 1991), addressed the requirements for a chain of custody:
“Proof of [an] unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of-the item.' Id. "In order to establish a proper chain,' the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988).”
590 So.2d at 919-20. Later, in Hale v. State, 848 So.2d 224 (Ala.2002), the Alabama Supreme Court reexamined its holding in Holton after the 1995 codification of § 12-21-13, Ala.Code 1975. The Supreme Court stated:
“Section 12-21-13, Ala.Code 1975, provides:
' “ ‘Physical evidence connected with or collected in the investigation of a crime shall not be excluded from con-sidération by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in -the investigation of a crime, the evidence shall be submitted to -the jury or court for whatever
*215 weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break -in the chain of custody concerning the physical evidence.’
“(Emphasis added.) This statute, by its terms, applies only tó ‘[pjhysical evidence connected with or collected in the investigation of the charged crime. To invoke the statute the proponent of the evidence must first establish that the proffered physical evidence is in fact the very evidence ‘connected with or collected in the investigation.’ Moreover,
“ ‘[i]n Land v. State, 678 So.2d 201 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.1996), a ease which appears to rely on § 12-21-13, this court .ruled that where a witness can specifically identify the evidence, and. its condition is not an issue in the case, then the State is not required to establish a complete chain of custody in order for the evidence to be admitted into evidence. We stated: “The eyeglasses were admissible without establishing a chain of custody because [the testifying officer] was able to specifically identify them, and their condition was not an issue in the case.” Land, 678 So.2d at 210.... ’
“Lee v. State, 748 So.2d 904, 912-13 (Ala.Crim.App.1999) (emphasis added).”
848 So.2d at 228-29 (emphasis in original).
Here, the State presented sufficient evidence establishing that the cigar , tip and the biological samples were collected in the investigation of Parker’s murder. At trial, Steve Owens, the police evidence technician who had collected evidence at Parker’s apartment, testified that he had collected the cigar, tip from Parker’s apartment after the murder. He packaged and sealed the cigar tip. The package was marked with the police case number and an item number. At trial, Owens, identified'the cigar tip by the item number as an item he collected in connection with the Parker murder. According to Owens, after the cigar tip was collected, packaged, and marked, he submitted it to the Birmingham Police Department property room.
Further, Dr.' Gregory Davis performed the autopsy on Parker’s body. During the autopsy, Dr. Davis swabbed, among other things, Parker’s vagina and a stain on her leg. Those swabs were then smeared on glass slides. After being examined twice, Dr.' Davis detected sperm on the slides. He then package those slides and kept them in an evidence locker until they were retrieved by Detective Chris Anderson. Dr. Davis identified the packages containing the slides at trial. According to Dr. Davis, the packages were in the same condition except that they had DFS stickers on them.
Later, Detective Chris Anderson retrieved those sealed items and took them to the DFS. Nathan Rhea, an expert in forensic DNA analysis at the DFS, viewing the packages identified by Owens and Dr. Davis, testified that those items were received by the DFS and that he recognized those items because the packages had his department’s case number, an item number, and his initials on them.
Accordingly, the State presented sufficient evidence to establish that the cigar tip and the biological samples submitted to the DFS were collected during the investigation of Parker’s murder. Owens and Rhea identified the same package containing the cigar tip, and Owens testified that he collected that cigar tip from Parker’s apartment. Further, Dr. Davis and Rhea identified the same package containing the glass slides, and Dr. Davis identified those slides as ones containing the biological material he collected from Parker’s vagina and leg. Accordingly, pursuant § 12-21- *216 13, Ala.Code 1975, the circuit court did not commit any error, much -less plain error, by allowing the DNA evidence to be admitted.[7]
XI.
White next argues that the circuit court erroneously allowed hearsay testimony establishing that the DNA from .the Black rape/murder matched the DNA profile from the Parker rape/murder. Specifically, White argues that Garl Mauterer, an expert in forensic DNA analysis at the DFS who performed the DNA analysis on biological material found on Black’s body, testified that he received a notice that the DNA collected from Black’s body matched the DNA collected from Parker’s body. According to White, Mauterer’s testimony was inadmissible hearsay because Mauterer did not perform the DNA analysis on the biological material collected from Parker’s body. Therefore, White argues that his conviction must be' reversed. This Court disagrees.
Contrary to White’s assertions, Mauterer’s testimony did not constitute hearsay. As stated above, “[hjearsay” is defined as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala. R. Evid. See also Belisle v. State, 11 So.3d 256, 298 (Ala.Crim.App.2007). “A statement offered for a reason other than to establish the truth'of the matter asserted therein is not hearsay,” Deardorff, 6 So.3d at 1216 (citing Smith, 796 So.2d at 814). Here, Mauterer did not testify to the truth of an out-of-court statement. Rather, he testified that he received a notice that the DNA collected from the Parker rape/murder matched the DNÁ recovered from the Black rape/murder. This testimony was not offered to establish that > DNA from the two crimes matched. Instead, it was. offered to show that a notice was sent out stating that the DNA from the two crimes matched and, thus, showed how White was developed as a suspect in the Parker rape/murder. Because Mauterer’s testimony was not offered for the truth of the matter asserted, no error occurred .by its admission.
Moreover, even if Mauterer’s testimony did constitute hearsay, any error in its admission was harmless. Rule 45, Ala. R.App. P. This Court has repeatedly held that “[ajriy error in the admission of hearsay testimony [is] harmless beyond a reasonable doubt when the testimony is cumulative to other lawfully admitted testimony.” Belisle, 11 So.3d at 299 (citing McNair v. State, 706 So.2d 828, 851 (Ala.Crim.App.1997)). See also Gobble v. State, 104 So.3d 920, 958 (Ala.Crim.App.2010) (same). Before Mauterer testified, Rhea properly testified that his analysis of the biological material collected from Parker showed that DNA collected from Parker matched DNA collected from Black. Because Mauterer’s testimony was cumulative to Rhea’s properly admitted testimony, any error in the admission of Mau-terer’s testimony was harmless. Belisle, 11 So.3d at 299.
XII.
White next argues that the circuit court erroneously allowed the State to introduce gruesome, irrelevant, and prejudicial photographs. Specifically, White argues that the circuit court erroneously allowed the State to introduce photographs depicting Black’s body as it was found. According to White, the photographs of Black’s body were unnecessary to ' the State’s case because they were cumulative to a crime-scene techni- *217 dan’s testimony. He further argues that the photographs were unduly prejudicial. Thus, White argues his conviction must be reversed. This Court disagrees. . ,
As stated above, evidence establishing that White raped and murdered Black was admissible under Rule 404(b), Ala. R.Crim. P., to establish his identity as the individual who raped and murdered Parker. Because White’s actions in raping and murdering Black were admissible to establish his identity, the evidence relating to facts underlying Black’s rape and murder and the circumstances of that crime were admissible. Jones v. State, 915 So.2d 78, 88 (Ala.Crim.App.2005).
Further, this Court has held:
‘“Generally, photographs are admissible into evidence in a criminal prosecution “if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate , or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.” ’ Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992),- rev’d, 625 So.2d 1146 (Ala.1998), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So,2d 154 (Ala.1986). ‘Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome,’ Williams v. State, 506 So.2d 868, 371 (Ala.Crim.App.1986) (citations omitted). In addition, ‘photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.’ Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). ‘This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.’ Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘“[Ajutopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to .an undisputed matter.” ’ Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1148 (Ala.2001), judgment vacated on other grounds, 586 U.S. 958 (2002), on remand to, 851 So.2d 458 (Ala.2002). ‘The same-rule applies for videotapes as for photographs: “The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury.” ’ Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990), quoting Walker v. State, 416 So.2d 1083, 1090 (Ala.Crim.App.1982). See also Ward v. State, 814 So.2d 899 (Ala.Crim.App.2000). Generally, ‘[a] properly authenticated video tape recording of the scene of the crime constitutes competent evidence’ and ‘is admissible over the defendant’s objections that the tape was inflammatory, prejudicial, and cumulative.’ Kuenzel v. State, 577 So.2d 474, 512-13 (Ala.Crim. App.1990), aff'd, 577 So.2d 531 (Ala. 1991). ‘Provided that a proper foundation is laid, the admissibility of videotape evidence in a criminal trial is a matter within the sound discretion of the trial judge.’ Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Crim.App.1986).’’
Brooks v. State, 978 So.2d 380, 393 (Ala. Crim.App.2007).
This Court has thoroughly reviewed , all the photographs relating to the Black rape/murder. The photographs were rele *218 vant and admissible to corroborate testimony establishing that Black and Parker had similar body types, were roughly similar in age, and were murdered in a similar manner. Although they are certainly unpleasant, the photographs are not unduly gruesome, and this Court concludes that their prejudicial • effect' did not outweigh their . probative value. Therefore, this Court holds that no error resulted from the admission of the photographs.
XIII.
White next argues that the circuit court erroneously denied his motion for a judgment of acquittal because there was insufficient evidence that he committed murder during a rape or during a burglary. Specifically, White argues that “the basis of the State’s capital- murder-rape and capital murder-burglary charges against Mr. White was-that, in the course of intentionally killing Jasmine Parker, [White] unlawfully remained in Ms. Parker’s home to forcibly compel her into sexual intercourse.” (White’s brief, at 87.) According to White, “[b]ecause the evidence at trial was insufficient to allqw a reasonable conclusion that Mr. White raped Ms. Parker, .neither the capital murder-burglary or the capital murder-rape charges should have been submitted to the jury.” (White’s brief, at 87.)
“In determining the sufficiency of the evidence to sustain a conviction, a reviewing court' must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecutioñ.” Powe v. State, 597 So.2d 721, 724 (Ala.1991) (citing Faircloth v. State, 471 So.2d 485 (Ala. Crim.App.1984)). “‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a'rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997) (quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992)). “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.” Sale v. State, 8 So.3d 330, 338 (Ala.Crim.App.2008) (quotations and citations omitted). .“The role of appellate courts is not to say what the, facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” Ex parte Stewart, 900 So.2d 475, 477 (Ala. 2004) (citations and quotations omitted).
Section 13A-5-40(a)(3), Ala.Code' 1975, provides, in relevant part, that “[m]urder by the defendant during a rape in the first or second degree” is a capital offense. Section 13A-5-40(a)(4), Ala.Code 1975, provides, in relevant part, that “[mjurder by the defendant during a burglary in the first or second degree” is a capital offense. For- capital-murder- purposes, a - person commits the crime of murder if he or she, with the “intent to cause- the death of another person, ... causes the death of that person....” § 13A-6-2(a)(l), Ala. Code 1975. “A person commits the crime of rape in the first degree if ... [h]e or she engages in sexual intercourse with a member of the opposite sex by forcible compulsion ,,” § 13A-6-61(a)(l), Ala. Code 1975. “A person commits the crime of burglary in the first degree if he or she knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, the person or another participant in the crime ... *219 [cfcuses physical injury to any person who is not a participant in the crime.... ” § 13A-7-5(a)(2), Ala.Code 1975.
White argues that the intent to commit rape was the intent relied upon by the State to satisfy the element of burglary that requires proof that White remained unlawfully in a “dwelling vuth intent to commit a crime therein.... ” § 13A-7-5(a), Ala.Code 1975. From there, White argues that the State presented insufficient evidence to establish that he raped Parker. . According to White, because the State presented insufficient evidence to establish that he raped Parker, it presented insufficient evidence indicating that he had the intent to rape Parker and, thus, failed to prove either capital murder/rape or capital murder/burglary. This Court disagrees.
The State presented evidence indicating that while investigating Parker’s murder, officers found a cigar tip containing White’s DNA in the apartment. Vanessa Parker testified that the cigar tip was not in the apartment the morning she and Parker went to work. Thus, the State established that White was in Parker’s apartment between 3:00 p.m. — when Parker left her mother’s work to go home,on the day of the murder — and 7:30 p.m., when her mother found her body.
The State also presented evidence establishing that there was a struggle in the apartment before' Parker’s murder. The State’s evidence established that White engaged in sexual intercourse with Parker. DNA from semen located in Parker’s vagina and on her Leg matched White’s DNA profile. Further, Parker’s body was found nude from the waist down with her shirt pulled up exposing her breasts. The State established that, while mostly nude, Parker was murdered by being strangled with her pants and- that her throat was slit.
• The .State also presented evidence establishing that1 White raped and murdered Black in a manner very similar to Parker’s rape and murder. Thus, the State presented evidence establishing White’s identity as Parker’s murderer.
Based on this evidence, the State presented sufficient evidence from which the jury could have reasonably inferred that White was in Parker’s apartment and struggled with and raped her while strangling her to death with her jeans. Accordingly, the State- presented sufficient evidence to sustain White’s convictions for murder during- a burglary and for murder during a rape.
XIV.
White next argues that because there was no evidence of a burglary independent of .the commission of the forcible rape, there was insufficient evidence to convict White of capital murder during the course of a burglary. According to White, the State’s only evidence establishing that he unlawfully remained in Parker’s apartment was evidence establishing that he raped her. White then argues that evidence of the commission of a crime, standing alone, is inadequate to support the unlawfully-remaining element of burglary.
It is well settled that, when a burglar was initially given permission of be in a house, evidence establishing that the victim and the burglar struggled is circumstantial evidence that the burglar’s license to be in the house was revoked and the burglar remained unlawfully. Brown v. State, 11 So.3d at 913. Although “evidence of a commission of a crime, standing alone, is inadequate to support the finding of an unlawful rem'aining, ... evidence of a struggle can supply the necessary evidence of an unlawful remaining.” Davis v. State, 737 So.2d 480, 484 (Ala.1999). Accordingly, although evidence establishing that the *220 defendant murdered the victim in the victim’s houses by a stealthy or instantaneous method would be insufficient to show that the license to be in the house had been revoked and'that the defendant remained unlawfully, the “choice to kill by a less-than-instantaneous technique [such as] strangulation” would be sufficient. Id.
Here, the State presented evidence indicating that White and Parker struggled in the apartment, knocking over furniture. The State also presented ^evidence establishing that White; raped Parker. The State’s evidence further established-that White then strangled Parker to death.
Based on the evidence establishing that White struggled with, raped, and strangled Parker, the State presented sufficient evidence from which the jury' could have found that'any license White had to be in Parker’s apartment had been revoked and he unlawfully remained there. Davis, 737 So.2d at 484. Therefore, this issue does not entitle White to any relief
XV.
White next argues that the circuit court failed to properly instruct the jury on weighing the aggravating and mitigating circumstances. Specifically, White argues that the circuit court instructed the jury to weigh the aggravating circumstances and the-mitigating circumstances but failed to inform the jury how, to vote after the weighing process. According to White, the circuit. court’s failure to, inform the jury how to vote after the weighing process “prevented jurors from understanding when, they should recommend a sentence of life or death.”, (White’s brief, at 93.) White did not. raise, this objection at trial; therefore, this issue is reviewed for plain error only.. Rule 45A, Ala. R.App. P.
White’s contention that the circuit, court failed to inform the jury how to vote after weighing the aggravating and mitigating circumstances, i.e., to vote for death if the aggravation outweighs the. mitigation or for life without the. possibility of parole if the mitigation outweighs the aggravation, is refuted by the record. 'At trial, the circuit court instructed the jury as follows:
“So ladies and gentlemen, if, after a full and fair consideration of all the evidence in this case, you are convinced beyond a reasonable doubt, that at least one aggravating circumstance does exist. And you are convinced that that aggravating circumstance outweighs any mitigating circumstance that,has been offered. Then the form of your verdict would be:
“ ‘We, the jury, find the Defendant to be punished by death.’

(t

“If, on the other hand, you find that the mitigating circumstances outweigh the aggravating circumstances, your verdict would be:
“We, the jury, find that the Defendant be punished of life imprisonment without parole.”
(R. 730.)
Because the circuit court instructed the jury on how to vote after it weighed the aggravating circumstances and the mitigating circumstances, White’s argument to the contrary is without merit. Albarran, 96 So.3d at 160 (“This assertion is refuted by the record and is without merit.”). Accordingly, this issue does not entitle White to any relief.
XVI.
White next argues that his death sentence must be vacated in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, White argues that his, death sentence is invalid under Ring because 'the jury did not . unanimously find that an aggravating *221 circumstance existed and because the jury did not unanimously find that the aggravating circumstances outweighed the mitigating circumstances.- White also argues that decision to impose the death penalty must be made by the jury as opposed to-a judge. Finally, White argues that this Court should .overrule the Alabama Supreme Court’s decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002).
In Ring, the United States Supreme Court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that, under the Sixth Amendment, a capital defendant is “entitled to a. jury determination of any fact [other than a pripr conviction] on which the legislature conditions an increase in their maximum punishment.” Ring, 536 U.S. at 589, 600. In Ex parte, Waldrop, 859 So.2d 1181 (Ala.2002), the Alabama Supreme Court applied Ring to a similar situation and held:
“[W]hen a defendant is found guilty of a capital offense, ‘any aggravating circumstance which the verdict convicting the defendant establishes was- proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.’ Ala.Code 1975, § 1SA-5-45(e); see also Ala.Code 1975, § 18A-5-50 (‘The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances- as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration-of that relevant circumstance or circumstances in determining sentence.’). This is known as ‘double-counting’ or ‘overlap,’ and Alabama courts ‘have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.’ Ex parte Trawick, 698 So.2d 162, 178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App. 1992).
“Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree,-a violation of Ala.Code 1975, § 18A-5-40(a)(2), the statutory aggravating- circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code.1975, § 13A-5-49(4), was ‘proven beyond a reasonable doubt.’ Ala.Code 1975, § 18A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Wal-drop’s case, the jury, and not the trial judge, determined the existence of. the ‘aggravating circumstance necessary for imposition of the death penalty.’ Ring, 536 U.S. at 609, 122,S.Ct. at 2443. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring [v. Arizona, 586 U.S. 584 (2002),] and Apprendi [v. New Jersey, 530 U.S. 466 (2000),] require.”
859 So.2d at 1188.
Like Waldrop, White was convicted of capital offenses .that have corresponding aggravating circumstances,. i.e., murder during the course of a rape and murder during the course of a burglary. See §§. 13A-5-40(a)(3), 13A-5-40(a)(4), 13A-5-49(4), AkuCode 1975. Accordingly, the jury’s verdict finding White guilty of the two counts of capital murder-established that the jury unanimously found that aggravating circumstances existed. Because the jury’s guilt-phase' verdict established that the jury found a fact necessary to expose White to a sentence of death, *222 White’s Sixth Amendment right to a jury was not violáted.
To the extent White argues that the Supreme Court’s holding in Ring was violated because the jury- did not unanimously find that the aggravating circumstances outweighed the mitigating circumstances, this argument is likewise .without merit. In Waldrop, the Alabama Supreme Court addressed an identical issue and held:
“The determination whether the aggravating circumstances outweigh the mitigating circumstances is. not a finding of fact or an element of the offense. Consequently, Ring [v. Arizona, 636 U.S. 584 (2002),] and Apprendi [v. New Jersey, 530 U.S. 466 (2000),] do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.”
Id. at 1190. Because the balancing of the aggravating and mitigating circumstances, i.e., the sentencing determination itself, is not a finding of fact that was necessary to expose White to a sentence of death, his death sentence does not violate Ring and Apprendi. Consequently, White is not entitled to any relief on this issue.[8]
Finally, to the extent White argues that only juries may impose a sentence of death, his argument is without merit. In Mitchell v. State, 84 So.3d 968; 993 (Ala.Crim.App.2010), this Court explained that judicial sentencing in capital cases is constitutional. Specifically, this Court held
“that the Constitution of the United States does not prohibit vesting the final sentencing authority in the circuit court. See Spaziano v. Florida, 468 U.S. [447,] 465 [(1984)]. ' Further, in Harris v. Alabama, the Supreme Court of the United States held that Alabama’s sentencing standard, which (at that time) required only that the judge consider the jury’s advisory opinion, was ‘consistent with established constitutional law.’ 513 U.S. 504, 511, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). The Court went on to explain that ‘the Eighth Amendment does not require the State to define- the wéight the sentencing judge must accord an advisory jury verdict.’ Id. at 512. Therefore, Mitchell’s argument that Alabama’s judicial-override provision is unconstitutional is without merit.”
Mitchell, 84 So.3d at 993. See also Ex parte Taylor, 808 So.2d 1215, 1218-19 (Ala.2001) (holding that the Constitution does not prohibit judicial sentencing); Hodges v. State, 856 So.2d 875, 934 (Ala.Crim.App.2001) (same).
Because the Constitution does not, as White argues, prohibit judicial sentencing in capital cases, his argument that only juries may impose a sentence of death is without merit. Therefore, this issue does not entitle White to any relief.
xvii;
White next argues that the circuit court erroneously allowed the jury to be death-qualified thus resulting in a conviction-prone jury in violation of his right to an impartial jury.
This Court has repeatedly rejected arguments identical to White’s argument. For instance, in Sockwell v. State, 675 So.2d 4 (Ala.Crim.App.1993), this Court held:
*223 “In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from ‘death qualification’ of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama Courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev’d in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App.1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).”
675 So.2d at 18; see also Revis v. State, 101 So.3d 247, 310-11 (Ala.Crim.App.2011) (same); McCray v. State, 88 So.3d 1, 76 (Ala.Crim.App.2010) (same); Vanpelt v. State, 74 So.3d 32, 50 (Ala.Crim.App.2009) (same).
Because the Constitution does not prohibit death-qualification of the jury in a capital-murder trial, the circuit court committed no error in’allowing the prospective jurors to be questioned about their views toward capital punishment. Accordingly, this issue does not entitle White to any relief.
XVIH.
White next argues that the circuit court erred by double counting elements of his capital offenses as aggravating circumstances. Specifically, White asserts that “[t]he double counting of rape and burglary as [both elements of his capital' offenses and] aggravating circumstances ... 'was constitutionally impermissible.” (White’s brief, at 97.)
Contrary to White’s assertion, there is no constitutional or statutory prohibition against double counting certain circumstances as both elements' of the offenses and aggravating circumstances. See § 13A-5-45(e), Ala.Code 1975 (providing that “any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing”). The United .States Supreme Court, the Alabama Supreme Court, and this Court have all upheld the practice of double counting. See Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (“The fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.”); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (“The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or m both).”); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Brown v. State, 11 So.3d 866, 929 (Ala.Crim.App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Jones v. State, 946 So.2d 903, 928 (Ala.Crim.App.2006); Peraita v. State, 897 So.2d 1161, 1220-21 (Ala.Crim.App.2003); Coral v. State, 628 So.2d 954, 965-66 (Ala.Crim.App.1992); Haney v. State, 603 So.2d 368, 379-81 (Ala.Crim.App.1991). Because double counting is constitutionally permitted and statutorily required, White is not entitled to any relief on this issue. § 13A-5-45(e), Ala.Code 1975.
XIX.
White also argues that Alabama’s method of execution — lethal injection — is unconstitutional.
This Court notes that White’s entire argument as to this issue consists of one paragraph and completely fails to offer any argument regarding why he believes lethal injection is unconstitutional. . Rather, White, in cursory form, declares that lethal *224 injection in. Alabama has not been found to comply with the standards established by the Supreme Court of the United States in Baze v. Bees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008); therefore, his sentence of death “constitutes cruel and unusual punishment in violation of the Eight and Fourteenth Amendments to the United States Constitution, the-Alabama Constitution and Alabama law.” (White’s brief, at 99.) White’s argument fails to take into account the fact that he bears the burden to establish that lethal injection constitutes cruel and unusual punishment. See Harris v. Wright, 93 F.3d 581, 583 (9th Cir.1996) (recognizing that the appellant bears a heavy burden to establish .that his sentence is cruel and unusual); cf. United States v. Johnson, 451 F.3d 1239, 1243 (11th Cir,2006) (explaining that the appellant bears the, burden to establish that his sentence in disproportionate); Cole v. State, 721 So.2d 255, 260 (Ala.Crim.App.1998) (recognizing that the appellant has the burden to establish that a State statute is unconstitutional); Holmes v. Concord Fire Dist., 625 So.2d 811, 812 (Ala.Civ.App.1993) (“The party mounting a constitutional challenge to a statute bears the burden of overcoming a presumption of constitutionality.”). Because White bears the burden to establish that lethal injection is unconstitutional, his argument that lethal injection is ünconstitutional until a court determines otherwise is without merit.
Moreover, this Court, in Saunders v. State, held that “lethal injection does not constitute per se cruel and unusual punishment. See e.g., McNabb v. State, 991 So.2d 313 (Ala.Crim.App.2007), and cases cited therein.” 10 So.3d 53, 111 (Ala.Crim.App.2007). Further, both the Supreme Court of the United States and the Alabama Supreme Court have held that lethal injection does not constitute cruel and unusual punishment. Baze, 553 U.S. at 54-56 (holding that lethal injection does not violate the Eighth Amendment); Ex parte Belisle, 11 So.3d at 839 (holding that lethal injection is not unconstitutional). White has not offered this Court any basis upon which to hold that lethal injection is unconstitutional.
Because White’s claim has béen rejected by the Supreme Court of the' United States, the Alabama Supreme Court, and this Court and because he has not offered this Court any reason to revisit that issue, ho is not entitled to any relief.
AAi
Finally, White argues that the circuit court’s order sentencing him to death was deficient for several reasons. The State agrees that the circuit court’s order fails to comply § 18A-5-47(d), Ala.Code 1975.
Section 13A-5-47(d), Ala.Code 1975, provides:
“Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5 — 51j and any additional [nonstatutory] mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall, also enter written findings of facts summarizing the crime and the defendant’s participation in it.”
See also Jackson v. State, 169 So.3d 1,113 (Ala.Crim,App.2013).
Here, the circuit court’s sentencing order fails to summarize the facts of the crime and White’s participation in it. Further, the circuit court failed to enter spe- *225 cifle written findings of fact regarding the “existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-40, each mitigating circumstance enumerated in Section 13A-5-51, and any additional [nonstatutory] mitigating circumstances offered pursuant to Section 1SA-5-52.” § 13A-5-47(d), Ala.Code 1975.
Consequently, this cause is remanded with instructions for the circuit court to enter a new sentencing order that fully complies with § 13A-5-47(d), Ala.Code 1975.[9] The circuit court’s new order should also “comply with the requirements of Ex parte Carroll, 852 So.2d 833 (Ala. 2002), and Ex parte Taylor, 808 So.2d 1215 (Ala.2001), [by setting] out specific reasons for giving the jury’s recommendation the weight that it gave it,” Jackson, 169 So.3d at 115, and it should “fully set forth [its] reasons for overriding the jury’s advisory verdict.” Yancey v. State, 65 So.3d 452, 480 (Ala.Crim.App.2009).
For the foregoing reasons, White’s capital-murder convictions are affirmed. This cause is, however, remanded to the circuit court with instructions for it to enter an amended sentencing order that fully complies with § 13A-5-47(d), Ala.Code 1975, and the requirements of Ex parte Carroll and Ex parte Taylor. The circuit court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 56 days after the release of. this opinion.
AFFIRMED AS TO CONVICTIONS; REMANDED WITH INSTRUCTIONS AS TO SENTENCING.
WELCH, KELLUM, and BURKE, JJ„ concur. JOINER, J,, concurs in part and concurs in the result in part, with opinion.

. At the time of trial, Owens was an enforcement agent with, the Alabama Beverage Con-trbl Board.

. ‘White also argues that evidence establishing his involvement in the Black rape/murdcr was hot admissible under Rule 404(b), Ala. R. Evid., to establish his intent to commit the Parker rape/murder. In its final jury instrue-tions, the circuit court "limited die juiy’s consideration of the 404(b) evidence to establishing White's identity. Therefore,' this Court will not address whether the evidence was properly admit! cd to establish intent.

. White also argues that evidence of the Black rape/murder was not admissible under Rule 404(b) because there was insufficient evidence to establish that he raped Parker. As discussed later in this opinion, the State presented sufficient evidence establishing that he raped Parker; therefore, this argument is without merit.

. In both this prosecution and the prosecution of the Black rape/murder, the circuit court suppressed the portion of White’s statement given before he was read the Miranda warnings.

. In Batson v, Kentucky, the Supreme Court of the United States established a three-part test to determine whether a party used its peremptoiy strikes in a manner that discriminates against a particular race in violation of the Equal Protection Clause, "In J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the United States Supreme Court further extended Batson to gender-based strikes.” Sharrief v. Garlach, 798 So.2d 646, 653 (Ala.2001), Thus, the analysis under Batson and J.E.B. is the same.

. A cigar tip found in Parker's apartment contained White's DNA, Parker’s mother testified that the cigar tip was not in the apartment when she and Parker loft for work the morning of the murder.

i Tlic condition of the evidence was not at issue at trial,

. White also makes several arguments regard- . ing why he believes this Court should overrule the Supreme Court’s holding in Ex parte Waldrop. However, this Court is bound by the decisions of the Alabama Supreme Court and has no authority to-overrule those decisions. See. § 12-3-16, Ala.Code . 1975; Whatley v. State, 146 So.3d 437, 489 (Ala.Crim.App. 2011).

. Because this Court remands this cause for the circuit court to amend its sentencing order, this Court pretermits any discussion of issues IV and VI in White’s brief which involve challenges to the circuit court’s decision to sentence White to death.

. White divides this issue into two subissues: 1) whether sufficient mitigating evidence supported the jury’s recommendation of life in prison without the possibility of parole and 2) whether the circuit court's rejection of the jury's recommendation conflicted with state and federal law. White cites no authority in support of his first subissue and contends only that the circuit court’s override "rendered Mr. White's sentencing fundamentally unreliable under state and federal flaw.” (White's brief on return to remand, at 11.) This Court considers White’s two subissues to be one issue and addresses it accordingly.